Sharon L. RUSSELL, Plaintiff,

v.

SALVE REGINA COLLEGE; Catherine E. Graziano, individually and in her capacity as a faculty member and as Dean of the Salve Regina College nursing department; Joan Chapdelaine, individually and in her capacity as a faculty member and clinical agency coordinator for the nursing department at Salve Regina College; Mary Lavin, individually and in her capacity as a faculty member at Salve Regina College; Maureen Hynes, individually and in her capacity as a faculty member at Salve Regina College; Barbara Dean, individually and in her capacity as a faculty member at Salve Regina College; Joann Mullaney, individually and in her capacity as a faculty member at Salve Regina College; and Sheila Megley, individually and in her capacity as a faculty member at Salve Regina College, Defendants.

Civ. A. No. 85–0628–S.

United States District Court, D. Rhode Island.

Nov. 17, 1986.

Hogan & Hogan, Edward T. Hogan and Donald J. Packer, East Providence, R.I., for plaintiff.

Tillinghast, Collins & Graham, Steven E. Snow, Douglas A. Giron and Paul M. Sanford, Providence, R.I., for defendants.

## OPINION AND ORDER

SELYA, District Judge.

This case, brought under diversity jurisdiction, 28 U.S.C. § 1332(a),[1] raises a host

---

1. Although the plaintiff has premised jurisdiction alternatively on 28 U.S.C. § 1331, her "federal question" claims necessarily march across unsteady ground. *See* Part III, *post.* But, inasmuch as Russell, on the one hand, and all of the defendants, on the second hand, are citizens of different states, and more than the requisite minimum amount is arguably in controversy, there is no authentic need to consider the plausibility of federal question jurisdiction.

of intriguing federal and state law questions in an exotic factual context. Briefly put, the plaintiff, Sharon Russell, a citizen and resident of East Hartford, Connecticut, was expelled from Salve Regina College ("Salve" or "College") because of her unwillingness and/or inability to control an extreme chronic weight problem. She now sues for damages. The defendants include the College and some seven Salve officials. The identity of each individual defendant and the relationship of each to the College is recounted with fidelity in the case caption, *see ante,* and it would be pleonastic to restate that data anew. The case turns on the scope of the College's unilateral authority to dismiss a student and on the manner in which the expulsion was effected in this instance.

The plaintiff's amended complaint contains some eight distinct statements of claim. The defendants have moved for summary judgment, Fed.R.Civ.P. 56(c), as to each and all of Russell's initiatives. The matter has been plethorically briefed and vigorously argued. The applicable legal standard is by now firmly embedded in federal jurisprudence; in the interests of expedition, the court merely reiterates what it said at an earlier date in *Gonsalves v. Alpine Country Club,* 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd,* 727 F.2d 27 (1st Cir.1984):

> It is well settled that summary judgment can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *United Nuclear*

*Corp. v. Cannon,* 553 F.Supp. 1220, 1226 (D.R.I.1982); *Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288, 1292 (D.R.I. 1982). In determining whether these conditions have been met, the Court must view the record in the light most favorable to the party opposing the motion, *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d at 986; *John Sanderson & Co. (WOOL) Pty. Ltd. v. Ludlow Jute Co.,* 569 F.2d 696, 698 (1st Cir.1978), indulging all inferences favorable to that party. *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir.1982); *O'Neill v. Dell Publishing Co.,* 630 F.2d 685, 686 (1st Cir. 1980).

With this preface, the court proceeds to narrate the undisputed facts,[2] to frame the issues more precisely, and to set forth its findings and conclusions.

## I. BACKGROUND

Salve is a religiously affiliated college located in Newport, Rhode Island, administered by the Sisters of Mercy of the Roman Catholic Church. Russell was admitted to the College by early decision in the winter of 1981–82. She began her studies in September 1982. Russell's interest in a nursing career antedated her matriculation: she had applied only to colleges with nursing programs and had expressed her intention to pursue such a course of study both in her original application to Salve and in her admissions interview. She commenced her academic endeavors at the College with the avowed intention of gaining admittance to Salve's program of nursing education.[3]

During her inaugural year at the College, there is rather fragile evidence that Russell sought some treatment for obesity.

---

**2.** The facts utilized by the court are drawn from the affidavits and documentary proffers of record, and from the parties' statements of material facts not in dispute. *See* D.R.I.L.R. 12.1, the text of which has been quoted in pertinent part in *McInnis v. Harley-Davidson Motor Co., Inc.,* 625 F.Supp. 943, 946–47 n. 2 (D.R.I.1986). As is required at this stage of the proceedings, the court has refrained from making credibility judgments, but has accepted the record at face value, indulging all contradictions and inferences in the perspective most flattering to the plaintiff.

**3.** Though the record is less than explicit, it appears that Salve requires students to undergo a minimum of one year in a liberal arts curriculum before undertaking a nursing concentration.

At various times during that school year, her 5'6" frame recorded weights between 306 and 315 pounds according to data on file at the College's health services unit. It is plain that, although she achieved no meaningful weight loss during her freshman year, Russell was considerably more successful as a student. Her work in liberal arts courses was adequate and her grades were respectable. Consequently, Russell was admitted to the nursing program, effective at the start of her sophomore year. She was given a copy of the "Nursing Handbook" (Handbook) issued by the College, and clearly understood that the Handbook set out the requirements for successful completion of the degree in nursing.

The fabric of Russell's aspirations began to unravel in the fall of 1983, when she entered her sophomore year (her first as a nursing student per se). The parties have presented an intricate (and sometimes conflicting) history of the interaction between the plaintiff and her sundry academic supervisors. It would serve no useful purpose at this juncture fully to recapitulate those events, or to attempt to reconcile every conflict. After all, the mechanism of Rule 56 does not require that there be no unresolved questions of fact; it is sufficient if there are no genuine issues remaining as to any *material* facts.

It suffices for the moment to say that there were myriad problems along the way: the agonizing search for uniforms and scrub gowns that would fit a woman of Russell's girth; a tendency on the part of faculty members to employ Russell in order to model hospital procedures incident to the care of obese patients; prolonged lectures and discussions about the desirability of weight loss; and so on and so forth. Indeed, the record reveals a veritable smorgasbord of verbal exchanges characterized by one side as "torment" or "humiliation" and by the other as "expressions of concern" or "forthright statements of school policy." (It takes little imagination to decipher which litigants are wont to apply which epithets to which actions.)

The court recognizes, of course, that sadism and benevolence—like beauty—often reside principally in the eye of the beholder. And, the court has neither the need nor the means to attempt to discern the subjective motives of myriad actors on the cold, fleshless record of a Rule 56 motion. For the purposes at hand, it is enough to acknowledge that an array of such incidents occurred and that, by the end of her sophomore year, Russell's size had become a matter of concern for all of the parties.

In her junior year, the plaintiff executed a contract (Contract) purporting to make her further participation in the College's nursing curriculum contingent upon an average weight loss of two pounds per week. The Contract was a singular sort of agreement. (It is reproduced in full as an appendix to this opinion.) Notwithstanding the signing of the Contract, Russell proved unable to meet the commitment, or even closely to approach it. Her body weight never fell appreciably below 300 pounds. Though the circumstances are complex, she seems to have made—and invariably to have broken—a series of promises in this regard. Predictably, an escalating level of tension began to characterize dealings between Russell and certain of the individual defendants.

The climax occurred on or about August 23, 1985. The plaintiff received a letter from the coordinator of the nursing program, defendant Chapdelaine, advising that she had been dismissed from the nursing department and from the College. Russell's education was concededly interrupted at that point (though, after a year's hiatus, she resumed her studies in nursing at another institution).

## II. STATEMENT OF THE CASE

Russell's complaint, as noted above, contains an octet of claims. Two of these supposed causes of action—Counts VI and VII—allege "federal" claims. Count VI charges the defendants with a denial of due process and an unconstitutional interference with the plaintiff's protectible liberty and property interests. Count VII alleges

handicapped discrimination in derogation of 29 U.S.C. § 794.

The remaining six counts implicate state law, and the parties (who agree on little else) concur that Rhode Island law governs in this diversity case. The state law claims possess a variety of characteristics. Two of these initiatives are contract-based: Count I alleges nonperformance of an agreement to educate and Count II asserts breach of an implied covenant of good faith and fair dealing. Three of the remaining state law initiatives are tort-based: Counts III and VIII posit intentional and negligent infliction of emotional distress, respectively; and Count IV remonstrates against a perceived invasion of Russell's privacy. Count V—which seeks redress for wrongful dismissal—is a contract/tort hybrid.

It is alleged throughout that the plaintiff lost a year of prospective employment in a job which she claims to have been offered contingent upon successful completion of her nursing degree. Russell seeks compensatory damages for this delay and for the physical and emotional trauma which she purportedly suffered as a result of what she views as the callous, humiliating, and wrongful conduct of the several defendants. The plaintiff also prays for exemplary damages, counsel fees, and costs.[4]

The court will first address the impact of the pending Rule 56 motion on the federal law claims, and will thereafter turn to a consideration of the other (state law) counts.

## III.  FEDERAL CLAIMS

Both of the claims which arise under federal law founder on essentially the same reefs and shoals: the College is not a "state actor," and its nursing curriculum is not a federally funded "program or activity" within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The court need not tarry overlong in putting these claims to rest.

### A.  Due Process

With respect to what the plaintiff envisions as an utter disregard for the niceties (or even the basics) of due process, the court has no need to reach the hotly-debated questions of whether Russell enjoyed any constitutionally protected interest, created by the terms of the Handbook or distilled from any other source. The fifth and fourteenth amendments to the Constitution apply only to the federal government and to the state, respectively—and derivatively, to those whose actions can fairly be attributed to federal or state government. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156–57, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). Even where an institution admittedly discriminates in its membership policies, there is no deprivation of due process unless the action in question sufficiently implicates the state so as to make the conduct "state action." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972).

To be sure, if the government plays the role of enforcer for privately originated discrimination, then the government may be forbidden to exercise its police power in furtherance of the discriminatory activity. *Shelley v. Kraemer*, 334 U.S. 1, 18–23, 68 S.Ct. 836, 844–47, 92 L.Ed. 1161 (1948). Or when the web of interconnection between the government and private bigotry is spun tightly enough to conclude that the government agency has "insinuated itself into a position of interdependence" with a discriminatory actor, then the challenged conduct must be subjected to fifth or fourteenth amendment scrutiny. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). Those maxims do not, however assist this plaintiff. The requirement of "state action" demands more than some (modest) interplay between the public

---

**4.** The complaint, though amended as recently as June 1986, continues to pray for unspecified injunctive relief. This prayer seems largely academic at the moment. The plaintiff has pursued her studies elsewhere, *see ante*, and has manifested no enduring desire to obtain reinstatement in Salve's nursing program.

and private sectors. Justice Rehnquist's caveat in *Moose Lodge, supra,* is particularly relevant here:

> The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in *The Civil Rights Cases, supra,* and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," *Reitman v. Mulkey,* 387 U.S. 369, 380, 87 S.Ct. 1627, 1633, 18 L.Ed.2d 830 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

407 U.S. at 173, 92 S.Ct. at 1971.

The First Circuit has given further content to this standard in its decision in *McGillicuddy v. Clements,* 746 F.2d 76 (1st Cir.1984). There, the court of appeals held that an accounting firm working under a contract with the state was not sufficiently connected with the government to place its conduct within the "state action" rubric. *Id.* at 77. *McGillicuddy* makes it plain that even a close relationship with government does not suffice, absent some meaningful entanglement, to invoke the rigors of due process.

■ Under *Moose Lodge* and its progeny, no "state action" can be discerned here. The fact that Salve was the recipient of a (rather meagre) library grant is manifestly insufficient to carry the weight of the assertion. The fact that the College's nursing program is, in certain respects, subject to state agency approval is likewise inadequate. In *Moose Lodge,* the discriminatory actor was licensed by the state, but that was not enough to impress the imprimatur of the state on the private actor's bigotry. *Id.* 407 U.S. at 177, 92 S.Ct. at 1973. The "mere fact that a business is subject to state regulations does not by itself convert its action into that of the state for purposes of the fourteenth amendment." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). *See also Rendell-Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982); *Jarrell v. Chemical Dependency Unit of Acadiana,* 791 F.2d 373, 374 (5th Cir.1983). These scraps of evidence, combined, do not turn the state action corner; and the record contains aught else. Though what little has been adduced must be construed in the light most favorable to the plaintiff, it utterly fails to demonstrate the slightest glimmer of the requisite governmental involvement. Accordingly, Count VI cannot stand.

### B. *Handicapped Discrimination*

■ In respect to the plaintiff's statement of claim under the Rehabilitation Act, 29 U.S.C. § 794, the teachings of the Supreme Court in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), are controlling. In *Grove City,* the Court held that a college which received federal funding only indirectly (that is, through tuition subsidies to students) was not subject in all its departments to the provisions of federal antidiscrimination law. *Id.* at 572, 104 S.Ct. at 1220. A private institution of higher education which, like Salve, receives federal monies exclusively through its students, is subject to federal antidiscrimination laws only with respect to its financial aid program. *Id.* at 574, 104 S.Ct. at 1222. And, it is well to note that, in this case, Russell does not charge that Salve discriminated against her in respect to scholarship assistance or other financial aid.

■ The plaintiff, although mouthing the empty conclusion that the College's nursing curriculum is a "program or activity receiving Federal financial assistance" as required by 29 U.S.C. § 794, has failed

to call the court's attention to any evidentiary fact which is capable of bearing the weight of that averment.[5] The law is transparently clear: the Supreme Court has decided the point in *Grove City* and has since cited that opinion with approval in the context of the very statute at issue here. *See Consolidated Rail Corp v. Darrone,* 465 U.S. 624, 636, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984). *See also Bento v. I.T.O. Corp. of Rhode Island,* 599 F.Supp. 731, 741–42 (D.R.I.1984). Absent proof that federal funding or financial assistance of any kind was involved in the College's nursing program, Russell can mount no cause of action against these defendants under 29 U.S.C. § 794. That being so, the difficult issue of whether Russell's obesity can be considered to be an "impairment" (handicapping condition) within the meaning of 29 U.S.C. § 706(7)(B) need not be reached—and the court expresses no opinion thereon.[6] The lack of any showing of the requisite federal subsidization necessitates the grant of *brevis* disposition in the defendants' favor on Count VII of the complaint.

## IV. STATE LAW CLAIMS

Conceptually, the plaintiff's claims for wrongful discharge (Count V) and for the transgression of a theoretical (implied) covenant of good faith and fair dealing (Count II) are linked by common ties in the relevant caselaw. So, the court proposes to deal with these initiatives ensemble. The same sort of approach will be taken with respect to the claims for infliction of emotional distress—intentional (Count III) and negligent (Count VIII), respectively—which likewise lend themselves to collective scrutiny. The remaining two state law causes of action will be treated individually.

### A. *Dismissal*

The plaintiff's remonstrance in Count V of the complaint, which apparently seeks to draw sustenance from an analogy to the employment relationship, postulates that even a collegian who has no contractual claim to a continuing place in the student body cannot be expelled without just cause. To be sure, some jurisdictions have evidently created such an open-ended cause of action in favor of at-will employees who have been peremptorily dismissed from their jobs. As an ultimate matter, the plaintiff's claim teeters because of her failure to discover *any* case in *any* jurisdiction from which it might be inferred that such a cause of action (if it existed at all) can—or should—be extended to the university/student context. But in this case, there is no need to speculate upon such a far-reaching extension of the at-will employment doctrine—for the underlying doctrine itself simply does not occupy a place in Rhode Island law.

▮ In the employer-employee environment, no less an authority than the Supreme Court of Rhode Island has recently spoken of the well-settled rule that "a promise to render personal services to another for an indefinite term is terminable at any time at the will of either party." *Rotondo v. Seaboard Foundry, Inc.,* 440 A.2d

---

5. The trivial amounts of money that Salve received to administer so-called Pell Grants and a cryptic reference in a musty document to a "Veterans Administration reporting fee" are at best de minimis. In no way can either of these items—which aggregated well under $3000—be construed to "fund" the College's nursing program.

6. In passing, it can be noted that a recent case from the Fourth Circuit provides an interesting perspective on the merits of Russell's discrimination claim. In *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986), an acrophobic plaintiff's handicap claim under the Rehabilitation Act of 1973 was rejected where the plaintiff testified at deposition that his fear of heights had never limited his major life activities. *Id.* at 934. Sharon Russell has testified that she does not consider herself handicapped; indeed her claim that she is well equipped to function as a nurse is central to her count in contract. *See* Part IV, *post.* The absence of the requisite federal nexus in this case obviates the need to balance Russell's denial of her handicapped status against the College's insistence that she cannot perform adequately as a nurse because of her corpulence. The question of whether a person who has the pluck to deny her ostensible handicap may still come within the protection of the Rehabilitation Act because she is perceived by others as handicapped must be left for another day.

751, 752 (R.I.1981). *See also Oken v. National Chain Co.*, 424 A.2d 234, 237 (R.I. 1981). Put another way, an at-will employment relationship "creates no executory obligations." *Dudzik v. Lessona Corp.*, 473 A.2d 762, 766 (R.I.1984). This hornbook principle has twice been accepted as an accurate reflection of Rhode Island law by this federal district court. *Lopez v. Bulova Watch Co., Inc.*, 582 F.Supp. 755, 767 n. 19 (D.R.I.1984) (Selya, J.); *Brainard v. Imperial Manufacturing Co.*, 571 F.Supp. 37, 39 (D.R.I.1983) (Pettine, J.). So, by logical extrapolation, Count V stands upon too unsteady a legal footing to survive the instant summary judgment motion.

It would seem that this reasoning and collocation of the authorities writes "finis" as well to the charge contained in Count II of the complaint. After all, the claim that the defendants have breached implied covenants of good faith and fair dealing in the course of terminating the relationship between Russell and the College relies largely on caselaw from other jurisdictions in the employer/employee context, and that authority is of no consequence in Rhode Island. *See ante.* Yet, the claimant responds, this count is sustainable by reference to the decision of the state supreme court in *AAA Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.*, 121 R.I. 96, 395 A.2d 724 (R.I.1978).

The *AAA Pool* decision is, however, a fetid sinkhole for this plaintiff. In that case, the Rhode Island Supreme Court held that the supposed existence of an implied covenant of good faith and fair dealing did not give rise to any independent cause of action in the property insurance milieu. *Id.* at 726.[7] Although the *AAA Pool* tribunal affirmed the state supreme court's earlier recognition of a generalized duty of fair dealing in contractual relationships, espoused in *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 297 A.2d 643, 645 (R.I.

1972), that generic duty was deemed inadequate to form the basis for an independent cause of action in tort in *AAA Pool.* It is similarly unavailing on the facts of the instant case.

A close look at *Ide Farm* is revealing. There, the state supreme court discerned "an implied covenant of good faith and fair dealing between parties to a (purchase and sale) contract *so that contractual objectives may be achieved." Id.* at 645 (emphasis supplied). The plaintiff in *Ide Farm* sought only to recover the benefit of a bargain foregone when the defendant/buyer failed to meet obligations which had arisen under a purchase and sale agreement. *Id.* at 643. *Ide Farm* did no more than acknowledge the existence of an action in contract for expectation damages against a party who failed to use best efforts to fulfill a promise. Nothing in the case suggests (or condones) the creation of an independent cause of action sounding in tort for consequential damages. The sole thrust of the opinion is toward the achievement of contractual objectives, not toward the establishment of a separate cause of action for punitive or consequential damages for tortious bad faith. Accordingly, *Ide Farm* is barren soil for the present plaintiff.

As mentioned earlier, Rhode Island has consistently rejected the notion that, without more, an action lies in favor of an at-will employee for an unfair or bad faith breach of some covenant implied by law. *See Rotondo, supra; Oken, supra. See also Lopez, supra; Brainard, supra.* Where, as here, the plaintiff was a college student rather than an employee, there is even less reason to believe that the state courts would afford her a right of action of the type which she asserts in Count II of her complaint. In the absence of any respectable precedent from the courts of Rhode Island favorable to the plaintiff's

---

7. Some state courts, including Rhode Island's, have created causes of action of this genre in the insurance context. *See, e.g., Bibeault v. Hanover Ins. Co.*, 417 A.2d 313 (R.I.1980); *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973). And, the *Bibeault* rule has been codified by statute. *See* R.I.Gen.Laws § 9–1–33. *Bibeault,* by its terms, opens no doors outside of the insurance industry. 417 A.2d at 318–19. Likewise, the statute has no application whatever beyond the insurer/insured relationship.

stance, and in an ambience where no court has intruded into the groves of Academe to reach so ambitious a result, this court cannot retailor state law to suit the plaintiff's specifications. After all, "[i]t is not for this court, sitting in diversity jurisdiction, to blaze a new trail where the footprints of the state courts point conspicuously in a contrary direction." *Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 927 (D.R.I. 1983).

■ There is, under Rhode Island law, no independently actionable covenant of good faith or fair dealing implicit in the university/student relationship. And, Russell has shown nothing which would enhance her case so as to extricate it from the operation of this general principle. The defendants' Rule 56 motion for summary judgment has merit insofar as it pertains to Count II, and must be granted.

### B. *Emotional Distress*

Counts III and VIII of the plaintiff's complaint dwell in the realm of emotional distress, the former alleging intentional infliction and the latter claiming injury in consequence of the defendants' negligence.

■ The court need pause only briefly in its consideration of Count VIII. Rhode Island law controls in this diversity case; and the state supreme court, in *Champlin v. Washington Trust Co.,* 478 A.2d 985, 988 (R.I.1984), has expressly rejected the viability of any cause of action for negligent infliction of emotional distress fashioned along the lines set out in § 313 of the Restatement (Second) Torts. Rhode Island has been slow to expand the horizons of the (narrowly-defined) cause of action for negligent infliction of emotional harm, *see Plummer v. Abbott Laboratories,* 568 F.Supp. at 922–27 (collecting cases), and Count VIII represents far too ambitious an initiative, given the current state of Rhode Island law. A federal court, of course, "must take state law as it exists: not as it might conceivably be, some day; nor even as it should be.... Plaintiffs who seek out a federal forum in a diversity action should anticipate no more." *Id.* at 927.

The early demise of Count VIII does not necessarily sound a death knell for Count III, as the claim asserted therein rests on a different legal footing. In attempting to invoke the standard of the Restatement (Second) Torts § 46, Count III tracks a path which is theoretically viable. Indeed, the state supreme court has heretofore recognized the existence of a cause of action patterned after § 46. *See Champlin,* 478 A.2d at 988.

The basic requisites of an intentional infliction claim are easily stated:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such body harms.

Restatement (Second) of Torts § 46 (1965).

Before addressing any questions related to the conduct alleged and its supposed effects, the court must first determine whether the university/student relationship comprises the kind of soil in which the seeds of a § 46 claim for emotional harm may sprout. We start, again, with *Champlin,* which recognized a cause of action for intentional infliction of emotional distress in the debtor-creditor context. *Id.* at 989. Any belief that *Champlin* might be limited to its own facts, or to the collection milieu, has been dispelled by the ensuing decision in *Elias v. Youngken,* 493 A.2d 158 (R.I. 1985). *Elias* held that some rather unpleasant communications between an employee and his supervisor could, in theory, furnish the basis for a cause of action for intentional infliction of emotional distress (though the particular conduct alleged in *Elias* did not meet the rigorous standard of § 46). *Id.* at 163–64. The state supreme court again assumed the existence of this particular cause of action without inquiry into its jurisprudential antecedents or conceptual underpinnings, and considered only the "threshold of conduct," 493 A.2d at 164, at which liability might be imposed. *Id.* at 163–64. Though *Elias* is sparse of phrase, both its language and tenor but-

tress a broad reading and application of *Champlin*. By extending the potential reach of the tort to the supervisor/employee relationship, *Elias* enhances the (already bright) prospect of construing the scope of § 46 so as to embrace other (kindred) pairings.

The caselaw from other jurisdictions does not suggest any basis for insulating the university/student setting from the operation of the general rule. *See* Note, 38 A.L.R.4th 998, 1003–1030 (1985) (reviewing cases). Without reaching the question of whether Rhode Island would limit the bounds of this tort to some particular sets of relationships, this court is persuaded that the uniquely vulnerable nature of the student's standing in the world of the university places that pairing squarely within the category of relationships which, on any reasonable taxonymy, would give rise to a duty to avoid the intentional infliction of emotional harm.

Such a conclusion marks only the beginning of the odyssey. While *Elias* and *Champlin* together imply a cause of action for intentional infliction of emotional distress, generally applicable in the circumstances of this case, there are high hurdles along the road to success on such claims. First, the concept of what might be termed "intentionality" is required to do double duty in these precincts. The interdicted conduct itself must be "intentional," that is, purposeful, wilful, or wanton. What is more, the harm that results must also be "intentional," that is, it must have been intended or least recklessly caused.

The face side of the coin is undoubtedly legible in this case. The conduct which the defendants undertook was volitional; what was done, was done purposefully. Whether or not the defendants intended the consequences that ensued, the acts that they committed vis-a-vis Russell were, without exception, the products of forethought and the conscious exercise of free will.

The flip side of the § 46 coin is much harder to read. In the *Champlin* phrase, the challenged conduct "must be intentional or in reckless disregard of the probabili-

ty of causing emotional distress." 478 A.2d at 989. The plaintiff does not argue that these defendants desired to cause her to suffer, or even that they knew such suffering was substantially certain to follow from their course of conduct. Rather, Russell contends that the concept of recklessness is subsumed within the concept of intentionality for these purposes. Prosser and Keeton weigh in on plaintiff's side of this issue:

[L]iability for extreme outrage is broader [than a literal interpretation of intentionality would allow] and extends to situations in which there is no certainty, but merely a high degree of probability that the mental distress will follow, and the defendant goes ahead in conscious disregard of it. This is the type of conduct which commonly is called wilful or wanton, or reckless.

Prosser and Keeton, *The Law of Torts* (5th ed. 1984) § 12 at 64 (discussing the requirement of extreme outrage).

There are four elements which must coincide under Rhode Island law to impose liability on such a theory:

(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

*Champlin*, 478 A.2d at 989.

Points (3) and (4) are of only passing interest at this juncture. The plaintiff has testified that she suffered nightmares, sleeplessness, nausea, vomiting, diarrhea, gastric upset, and hypoglycemic attacks in the wake of the defendants' conduct. There is ample evidence in the record to withstand Rule 56 scrutiny on the last two prongs of the *Champlin* test. And, the first two prongs can, for the purposes at hand, be viewed as susceptible to measurement by a merged yardstick: reckless disregard *cum* outrageousness. The question becomes whether or not Russell has prof-

fered enough in the way of proof to create a genuine issue of material fact as to this criterion.

The combined standard is a stringent one. The oft-cited comment (d) to § 46 of the Restatement (Second) of Torts (1965) provides:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

▌ Whether the conduct of a given defendant surpasses the bounds of decency is a function of three factors: (i) the conduct itself, (ii) in light of the particular relationship of the parties, (iii) having in mind the known (or knowable) susceptibility of the aggrieved party to emotional injury. These can best be assayed, in this case, in the inverse order of their appearance. Russell was a known quantity. Despite her evident sensitivity to weight-related emotional trauma, and her documented history of precarious emotional balance and tenuous self-esteem, the individual defendants—well-educated professionals all—plowed ahead. Given the full panoply of the circumstances, the proposition that they acted in reckless disregard of the probability that an obese youngster's psychic equilibrium could easily be knocked askew seems fairly debatable. This conclusion is fortified by a glimpse of the middle factor. The student stands in a particular-

ly vulnerable relationship vis-a-vis the university, the administration, and the faculty. She is away from home, subject to the authority and discipline of the institution, and under enormous pressure to succeed. The relationship of these parties was such that the defendants could fairly be expected to have acted maturely—and even with some tenderness and solicitude—toward the plaintiff.

Seen in this context, the defendants' conduct, as the plaintiff has portrayed it, cannot be said as a matter of law to stumble on the threshold of outrageousness. To be sure, the law does not shield a person from words or deeds which are merely inconsiderate, insulting, unflattering, or unkind. The courts possess no roving writ which warrants intervention whenever someone's feelings are hurt or someone has been subjected to a series of petty indignities. And, there must be room for some lack of courtesy and finesse in interpersonal relations. In *Champlin*, for example, the state court ultimately declined to impose liability because of the need to afford a creditor "reasonable latitude in the manner in which it seeks to collect overdue notes, even though there may be times when these methods might cause some inconvenience or embarrassment to the debtor." *Champlin*, 478 A.2d at 989–90.

▌ Yet, the behavior challenged here, viewed in the light most favorable to the plaintiff's case, seems to be shaped of sterner stuff. Although a private college must be afforded wide discretion in enforcing its scholastic standards and in disciplining its students, there is no justification for debasement, harassment, or humiliation. The academic mise en scene, in any reasoned view, is considerably more civilized than the debtor-creditor environment, and there is correspondingly less play for roughness.[8] Given the trust implicit in the student's selection of a college, and the peculiar vulnerability of undergraduates, the facts set forth by the plaintiff, if ultimately proven, comprise a scenario which is far more con-

---

**8.** The relationship among students—as opposed to that between the institution and the student body—is a different kettle of fish, not on today's menu.

science-provoking than the *Champlin* counterpart. The indignities which Russell asserts have been practiced on her are arguably offensive in the extreme, perhaps repugnant to the norms which one would expect to flourish in the academic world. Taken from the plaintiff's coign of vantage, the behavior in question, if it is shown to be as obnoxious as the plaintiff in her Rule 56 opposition suggests, might well be thought by a properly-instructed jury to be so atrocious as to be actionable. As a general matter, the plaintiff appears to have raised sufficient doubt as to the quality of the defendants' actions to blunt the summary judgment ax. *See Cortes Quinones v. Jimenez Nettleship*, 773 F.2d 10, 15 (1st Cir.1985) (per curiam) (summary judgment inappropriate where the parties "have raised sufficient unanswered questions to require [the] case to go forward with more complete development of the facts.").[9]

**C.  *Right to Privacy***

Count IV of the complaint posits a supposed invasion of Russell's privacy. No such cause of action was recognized at common law in Rhode Island. *See Champlin*, 478 A.2d 988 n. 2. The General Assembly, however, filled this perceived void in 1980 by the enactment of a statute which is now codified at R.I.Gen.Laws § 9–1–28.1 (1985 Reenactment) (Privacy Act). The Privacy Act,[10] which established a "right to be secure from unreasonable intrusion upon one's physical solitude or seclusion," *id.* at § 9–1–28.1(a)(1), must necessarily inform this court's determination of the motion sub judice insofar as the fourth count of the complaint is concerned.

The court treads on near-virgin ground in venturing to interpret this neoteric statutory right. The state supreme court, in a rather cryptic footnote in *Champlin*, 478 A.2d at 988 n. 2, wrote that Ms. Champlin's claim for invasion of privacy was moot

---

9. In pressing their motion for summary judgment as to Count III, the defendants have painted with the broadest imaginable stroke. Their asserted position is that Russell has not made out a claim against *any* defendant. The court has now held to the contrary. *See* text *ante.* The next logical question—whether, given the overall viability of the claim, any one or more of the defendants nevertheless deserves immunity because of the absence of evidence of individual culpability—has not been addressed by the movants, and the court will not gratuitously fill the void. *Cf. Blue Cross of Rhode Island v. Cannon*, 589 F.Supp. 1483, 1494 n. 15 (D.R.I. 1984) (though motion to dismiss a single count of a complaint has been granted on a ground which probably undercuts certain other counts as well, court will not act sua sponte, but will await the filing of properly-focused motions). Thus, it is not necessary at this juncture to scan the record so as to assess each defendant's contribution (or lack thereof) to the miseries which Russell laments.

10. The Privacy Act declares in pertinent part:
(a) Right to Privacy Created.—It is the policy of this state that every person in this state shall have a right to privacy which shall be defined to include any of the following rights individually:
(1) The right to be secure from unreasonable intrusion upon one's physical solitude or seclusion;
(A) In order to recover for violation of this right, it must be established that:

(i) It was an invasion of something that is entitled to be private or would be expected to be private;
(ii) Such invasion was or is offensive or objectionable to a reasonable man; although,
(B) The person who discloses such information need not benefit from such disclosure.
* * * * * *
(3) The right to be secure from unreasonable publicity given to one's private life;
(A) In order to recover for violation of this right, it must be established that:
(i) There has been some publication of a private fact;
(ii) The fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities;
* * * * * *
(B) The fact which has been disclosed need not be of any benefit to the discloser of such fact.
(b) Right of Action.—Every person who subjects or causes to be subjected any citizen of this state or other person within the jurisdiction thereof to a deprivation and/or violation of his right to privacy shall be liable to the party injured in an action at law, suit in equity or any other appropriate proceedings for redress....
R.I.Gen.Laws § 9–1–28.1(a)(b) (1985 Reenactment).

because to "establish[] a violation of her right of privacy, [the plaintiff] would have had to satisfy the requirements of § 46" of the Restatement (Second) of Torts (1965). On the facts of *Champlin,* the court seemed to say, the cause of action at common law for intentional infliction of emotional distress merged, as a practical matter, with the statutory claim for invasion of privacy. In support of this proposition, the *Champlin* court cited *Dawson v. Associates Financial Services Co. of Kansas, Inc.,* 215 Kan. 814, 820, 529 P.2d 104, 110 (1974). To be sure, *Dawson*—which, like *Champlin,* was a debtor-creditor case—did treat the two causes of action interchangeably and held that the stringent standard of liability for intentional infliction of psychic harm should govern the merged claims. In so doing, however, the Kansas Supreme Court relied heavily on the nature of debtor-creditor intercourse:

> When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy.... [D]ebtors' tender sensibilities are protected only from oppressive, outrageous conduct.

*Id.* at 820–21, 529 P.2d at 110.

■ The *Dawson* court made it clear that the right of privacy is normally governed by the more relaxed standard of liability that requires a finding of conduct "highly offensive to a reasonable man." *Id.* at 822, 529 P.2d at 111. By its allusion to *Dawson* in the *Champlin* footnote, therefore, it would seem that the Rhode Island Supreme Court placed a Restatement § 46 gloss on rights afforded by the Privacy Act only in the (predictably) rough-and-ready precincts in which the relationship of debtor and creditor holds sway. *See McMenamin v. Bishops,* 6 Wash.App. 455, 493 P.2d 1016 (1972); *Lewis v. Physicians, Etc. Bureau,* 27 Wash.2d 267, 177 P.2d 896 (1947); *Norris v. Maskin Stores, Inc.,* 272 Ala. 174, 132 So.2d 321 (1961).

Yet, the case at bar arises in a far different—and more urbane—sort of institutional context, one which conduces toward reading R.I.Gen.Laws § 9–1–28.1(a)(1) exactly as it was written, thereby providing a remedy for "unreasonable intrusion upon one's physical solitude or seclusion (that).... was or is offensive or objectionable to a reasonable man." *Id.* The relationship is such that Russell could reasonably have expected to be granted a considerable degree of privacy as to intimate, personal matters. Thus, a literal reading of the Privacy Act reaches the perimeter of this claim. The court so holds.

■ Once it has been determined that Count IV states an actionable claim, the record reflects the presence of facts adequate to preclude summary judgment. Section 9–1–28.1(a)(1) does not speak in terms of the "publication" of a private fact, but rather in terms of "an invasion of something that is entitled to be private or would be expected to be private." *See ante* n. 10. To be sure, there was nothing private or confidential about Russell's corpulence (it was there to be seen at the most casual glance), so drawing attention to her girth would not, in and of itself, be actionable as an invasion of privacy under Rhode Island law. Yet, there was considerably more here: the continual inquiry into the progress of the plaintiff's diet, the scrutiny of her personal weight loss records, the exaggerated interest in what forbidden morsels Russell ingested, and the preoccupation with her perceived lack of self-discipline, to name but a few variations on the intrusive theme which the defendants played. These provocations coalesce to fit comfortably within the species of conduct which a trier of fact could reasonably find offensive or objectionable. And, this is especially true inasmuch as few things are more personal or private to a young, single person than weight and one's efforts to control it. Accordingly, the Rule 56 motion misfires as to this statement of claim.[11]

---

11. This is not to say that there is, on this record, a jury question as to whether *all* of the defend-

ants invaded the plaintiff's privacy; it is merely to note the existence of evidence that *one or*

## D. *Implied Contract*

The final issue to be addressed is the contract claim asserted in Count I.[12] It is accepted law that the relationship between student and university is contractual in nature. *Corso v. Creighton University,* 731 F.2d 529, 531 (8th Cir.1984); *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). Concededly, the specific character of this sort of contractual relationship is somewhat amorphous. The contract is " 'not an integrated agreement, the standard is that of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *Id.* at 202, quoting *Giles v. Harvard University,* 428 F.Supp. 603, 605 (D.D.C.1977); *accord Cloud v. Trustees of Boston University,* 720 F.2d 721, 724 (1st Cir.1983). *See also Slaughter v. Brigham Young University,* 514 F.2d 622, 626 (10th Cir.) ("The student-university relationship is unique and it should not be and cannot be stuffed into one doctrinal category"), *cert. denied,* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975); *Napolitano v. Princeton Univ. Trustees,* 186 N.J. Super. 548, 453 A.2d 263, 272–73 (1982) (university/student relationship cannot be described either in purely contractual or associational terms).

If a contract existed, it came into being when Russell matriculated at Salve, and she and the College, as the contracting parties, would be the real parties in interest. The nisi prius roll shows clearly that no express agreement embodied the kind of terms which the plaintiff alleges permeated the relationship. Thus, the court must ascertain whether the implied agreement between the College and its (former) pupil arguably extended far enough to support Russell's present litigation. Upon close perscrutation, the court finds that the disputed facts surrounding the terms of the "contract" provide sufficient grist to warrant turning the mill of jury deliberation. The record is not so clear as to entitle Salve to summary judgment on Count I at this stage of the proceedings.

Salve formulates a variety of positions in its search to justify *brevis* disposition of the flagship count of the plaintiff's complaint. In the first place, the institutional defendant asseverates that the scales of "reasonable expectation" should be tipped by the provisions of the Handbook, a pamphlet which admittedly affirms the important parallel between a nursing student's health status and the health of the patients whom the nurse hopes to serve. The Handbook requires each student to inform the clinical coordinator of particular health problems; indeed, nursing students must sign a form for the clinical placement program each semester that vouchsafes full disclosure of all medical abnormalities. And, the Handbook reserves to the coordinator discretion to determine whether a student's participation in the clinical program is contraindicated because of health. The standardized form signed by all students states: "I will accept the decision of the Clinical Agency Coordinator and Department Chairman as final as to whether or not I can function in the Clinical Area." The College has an obvious interest in ensuring that a student poses no health risk to herself or others as she proceeds into a clinical placement. But, howsoever rational the College's generalized requirements might be, the application of those requirements in Russell's case is another matter.

Contagion was not legitimately at issue—after all, there is no allegation of communicable corpulence here—nor have the defendants essayed any showing that clinical work would have jeopardized Russell's own wellbeing.

The only possible bases for prohibiting the plaintiff from clinical training were ei-

---

*more* of the defendants may have done so. That being so, and the movants having eschewed any individualized attacks on the sufficiency of the proof, the court need go no further. *See ante* n. 9.

**12.** Count I is asserted against the College alone, *see* Complaint ¶ 19(c); thus, Salve is the only movant in this wise.

ther (i) that her obesity would impede satisfactory performance of her duties, or (ii) that her appearance would be a poor example for patients.

■ The college cannot plausibly argue, however, that Russell was bound unconditionally to accept the decision to exclude her from further participation in the clinical placement program, regardless of how arbitrary or irrational that decision might have been. As a matter of Rhode Island law, "[t]here is no doubt that ordinarily if one exacts a promise from another to perform an act the law implies a counter promise against arbitrary or unreasonable conduct on the part of the promisee." *Psaty & Fuhrman v. Housing Authority,* 68 A.2d 32, 35 (R.I.1949). And, at the very least, the reasonableness of either of the possible lines of thought limned above is open to serious question.[13]

In the circumstances at bar, there are competing inferences which can be drawn. There is evidence which, if credited, tends to show that Russell's girth did not reduce her proficiency. The argument that her overweight condition was deleterious to patients as a matter of example rests, at this point, on sheer speculation. Accordingly, the decision to expel Russell, insofar as it prescinds from the Handbook, must be tried to determine whether it was the product of reason or caprice. Summary judgment would be an inappropriate means of resolving the conflict.

The second morsel in Salve's Count I cupboard is equally unavailing. In a nutshell, the College argues that Russell failed one of the courses prerequisite to completion of her nursing degree, thereby justifying her dismissal and eliminating the need for further inquiry. Yet, there is evidence that the instructor admitted that all of Rus-

sell's deficiencies in this course were "directly related" to the claimant's obesity. On this record, a genuine question exists as to whether adiposis was, in Russell's case, a legitimate impediment to due fulfillment of the clinical requirements of the nursing program (as Salve maintains), or whether the College's evaluation was tainted by an unreasonable aversion to obesity or by a desire to expel Russell because she did not conform to the "Salve image."

There is considerable evidence in the record attesting to the plaintiff's competence as a student and as a nurse, notwithstanding her one negative evaluation by the defendant Lavin. On August 20, 1985, just one day before Chapdelaine's billet-doux was authored, the plaintiff's supervisor at Hartford Hospital, Patricia Reilly, wrote that she "looked and acted in a very professional manner. Her attendance was excellent and her performance very good. I would be most pleased to hire her as a professional nurse. In fact, I expect to be able to offer her a position for June of 1986." After her dismissal from the College, Russell was promptly admitted to the nursing program at St. Joseph's College (also operated by the Sisters of Mercy). She completed the program there without incident.

■ While the court is sensitive to the importance of academic freedom and recognizes that deference must be accorded to the reasonable judgment of responsible College officials, the question of reasonableness is in too precarious a balance here to permit summary disposition. Faced with contrary opinions from qualified health care professionals and particularized allegations of personal animosity born of obesophobic obsession, this issue, viewed in the manner most hospitable to the plain-

---

**13.** To the extent that the printed form which Russell completed (under which the clinical coordinator's decision is classified as "final") is material to this issue, the document must be construed strictly, with all doubts resolved against Salve (as the originator of the form). This is true under Rhode Island law, *see Fryzel v. Domestic Credit Corp.,* 385 A.2d 663, 666–67 (R.I.1978); *A.C. Beals Co. v. Rhode Island Hospi-*

*tal,* 292 A.2d 865, 872 (R.I.1972); *Zifcak v. Monroe,* 249 A.2d 893, 896 (R.I.1969), and as a matter of interscholastic jurisprudence, *see, e.g., Corso v. Creighton University,* 731 F.2d at 533 (in university-student relationship where "contract is on a printed form prepared by one party, and adhered to by another who has little or no bargaining power, ambiguities must be construed against the drafting party").

tiff's case, survives Fed.R.Civ.P. 56 scrutiny.

The same sort of reasoning applies to the claim that Russell, having signed a document which pledged a weight loss of two pounds per week as a condition of continuing her studies in the College's nursing department, *see* Appendix, was open to ouster for her failure to abide by her written promise. (After all, the Contract itself provided that a failure to achieve the stated goal would result in "voluntary and immediate withdrawal from the nursing program at Salve Regina College.") But, though it is beyond dispute that the plaintiff did not shed the required poundage, issues of material fact exist as to duress, coercion, and her state of mind, generally, upon the execution of the document. Moreover, as the plaintiff notes, there was no readily ascertainable consideration for her promise. If certain (arguably plausible) inferences are drawn in the manner least favorable to the movant, the weight loss covenant can be seen not as an avenue of defense, but as a product of the invidiously discriminatory course of conduct which the defendants displayed in Russell's case. Finally, the oxymoronic concept of a student essaying a "voluntary withdrawal" against her will, *cf. Chang v. University of Rhode Island*, 606 F.Supp. 1161, 1237 (D.R.I.1985), itself stirs doubts.

In sum, the Contract is at best a useful piece of evidence to assist in constructing the jigsaw of contractual terms, and at worst a piece of paper which is meaningless except as proof of the defendants' malevolence. In any event, it is not dispositive, as a matter of law, of the merits of Count I. It is impossible to apply the standard of "reasonable expectation," *Lyons*, 565 F.2d at 202, to Russell's situation without the aid of precisely the sort of factfinding which battens the Rule 56 hatch. Inasmuch as the viability of Russell's breach of contract claim will depend on the resolution of questions of disputed fact, *brevis* disposition must be withheld on this count.

## V. CONCLUSION

The problems presented by this lawsuit are weighty in every sense of the word. The case emphasizes the uncertain configuration of the boundaries which surround important, but markedly different, values: the necessarily broad freedom which academic administrators must possess in order to operate institutions of higher learning, the rights of a student of tender years to be sheltered from gratuitous debasement or intrusiveness (or worse, from malicious conduct which offends fundamental notions of human decency), the standards of behavior which a university and an undergraduate can reasonably expect from each other. At this relatively early stage of the instant litigation, it remains somewhat unclear as to precisely where on this dimly-lit terrain the College's conduct vis-a-vis Russell falls. So, the illumination of further factfinding seems essential in order to clarify certain of the issues and to map the rights and liabilities of the parties more exactly.

In summary, the court holds that the defendants, and each and all of them, have demonstrated an entitlement to summary judgment in their favor on Counts II, V, VI, VII, and VIII of the complaint. There are, as to these initiatives, no genuine questions of material fact. For the reasons stated, the defendants deserve to prevail thereon as a matter of law. Conversely, the motion for summary judgment must be denied as to Counts I, III, and IV of the complaint. Russell has shown enough steel to put the defendants (or some of them, *see ante* nn. 9, 11) to their mettle on these claims.

The motion for summary judgment is *granted in part and denied in part,* as outlined above. As to those counts upon which the defendants have prevailed, entry of final judgment shall be withheld pending disposition of the remaining claims. Fed.R. Civ.P. 54(b). *See Bank of New York v. Hoyt,* 108 F.R.D. 184, 186–87 (D.R.I.1985).

*It is so ordered.*

## APPENDIX

### CONTRACT

I, Sharon Russell, agree to the following conditions for continuing in Nursing 312

during the Spring 1985 Semester. I understand that failure to meet any and all of these conditions will result in my voluntary and immediate withdrawal from the Nursing Program at Salve Regina College thus making me ineligible for Nursing 411.

1. Maintain a minimum weight loss of 2 pounds per week effective immediately.
2. Report to Mrs. Chapdelaine or Faculty Secretary weekly (every Friday morning) with evidence of progress in weight loss program. This will commence January 25, 1985.

   NB—Report January 22nd for first accounting after the holiday.
3. Maintain academic standing as required.

Additionally, I will be aware of all requirements listed in the Nursing Department Handbook, 1983–85 Edition.

/s/ Sharon Russell
Sharon Russell
Dec. 18, 1984
Date
/s/ Catherine E. Graziano, RN
Witness