James A. ELIAS

v.

Heber W. YOUNGKEN et al.

No. 82–292–Appeal.

Supreme Court of Rhode Island.

May 24, 1985.

Natale Urso, Urso, Liguori and Urso, Westerly, for plaintiff.

John T. Walsh, Jr., Higgins, Cavanagh & Cooney, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This is an action wherein the plaintiff seeks recovery for libel, breach of contract, negligent supervision, and intentional infliction of emotional distress arising out of his departure from employment at the University of Rhode Island.[1] The case was tried in the Superior Court before a jury over a period commencing March 9, 1982, and ending on March 18, 1982. At the conclusion of all of the evidence, the defendants made a motion for a directed verdict, which was subsequently granted by the trial justice. The plaintiff now appeals. We affirm the judgment below. The facts of the case from which the controversy arose are as follows.

From 1972 to 1978 James A. Elias (Elias) was employed by the University of Rhode Island (URI) as director of Pharmacy Services and clinical instructor at URI's College of Pharmacy. His job essentially entailed serving as pharmacist at URI's Health Center Pharmacy and giving instruction to pharmacy students whose course curriculum included being assigned to observe and participate in the pharmacy's activities. Ultimate responsibility for the pharmacy resided in Heber W. Youngken, Jr. (Youngken), who was the pharmacy's licensee. Youngken concurrently had overall responsibility for the university's Student Health Services and also served as dean of the College of Pharmacy.

During the first three months of 1978, a series of events led to the discharge of James Elias by the university. In order best to detail the chronology, we refer to a set of correspondence between Youngken and Elias during this period. In a letter dated January 30, 1978, which followed up a meeting of January 26 with Elias, Youngken expressed concern about management problems in the pharmacy and about the need for better communication between Elias and his supervisors. Elias responded to these and other criticisms by returning a memo of his own to Youngken on February 14.

At approximately this same period of January through March 1978, Elias took a series of sick leaves in order to be with his daughter, who had been hospitalized with an undiagnosed ailment. Elias took three and one-half days off at the end of January, the last two weeks of February, and the first two weeks of March to attend to his sick daughter. When called at the hospital on a number of occasions by Youngken and asked when he could be expected to return to his work, Elias told Youngken that he would return as soon as he knew what was ailing his daughter.

Meantime, Youngken sent a letter dated February 15 to Elias both acknowledging Elias's sick-leave absences and expressing concern that Elias had failed to answer questions about the management of the pharmacy that were raised in Youngken's initial letter of January 30. Youngken also noted the difficulties of operating the pharmacy full time with Elias's irregular absences. Elias then responded to Youngken in a memo dated March 6, 1978, castigating Youngken for his "harassments." The next day, Youngken sent Elias another letter indicating that in view of Elias's uncertainty about when he would be returning to work, a full-time replacement for Elias would have to be found.[2]

1. The plaintiff brought this case against Heber W. Youngken, individually and as dean of the College of Pharmacy of the University of Rhode Island; the Rhode Island Board of Regents for Education; the University of Rhode Island; and the State of Rhode Island and Providence Plantations. However, since all of the wrongs of which complaint was made were based upon the action of Heber W. Youngken, we shall refer

to him as though he were the sole defendant in this case. The liability of other defendants would be vicarious and dependent upon the alleged wrongful conduct of Youngken.

2. Elias's position was subject to reappointment each year. At the period now under review, serious consideration was being given to reducing or eliminating the job of full-time pharma-

Elias then returned to work at the pharmacy on March 15. A week later, however, he contracted influenza and was forced to stay home for approximately four days. In the interim on March 17, 1978, Youngken sent him a letter indicating that Elias's employment was being terminated because of his lack of communication with his supervisors, his mismanagement of drugs and supplies in the pharmacy, his failure to instill confidence in his management style on the part of his coworkers, and his failure adequately to apprise his coworkers and supervisors of his absences in order that the pharmacy might be made to run smoothly and without interruption.

By this point Elias had gotten in touch with his attorney, who subsequently contacted the university and negotiated with its personnel department an agreement providing, inter alia, that Elias would relinquish any claims against the university in return for the university's removing any derogatory material from Elias's personnel file.[3]

In September of 1978, Youngken's office prepared a booklet signed by Youngken as dean and provost for Health Science Affairs entitled "Annual Report 1977–1978, College of Pharmacy, University of Rhode Island," which was delivered to the Office of the President of URI in November 1978. At the top of page seven of the report was the heading "Faculty and Staff Changes 1977–78." Listed below were appointments to and resignations from the College of Pharmacy staff. The last of such announcements stated, "James Elias was terminated as Pharmacist at the URI Student Health Center at the end of the academic year. Mrs. Jane Doe, B.S. (Rhode Island) will assume these duties in September, 1978."[4] Elias first saw the annual report in January of 1979. After his departure from URI, he had obtained employment as a staff pharmacist at Rhode Island Hospi-

cist at the URI Health Services Pharmacy and having that position staffed by multiple part-time employees. This circumstance, of course, when added to the difficulties that he was already having, significantly diminished Elias's chances of full-time reappointment at the close of the 1977–78 academic year.

3. The memorandum of agreement, which was undated, provided:

"In consideration of and exchange for the acts and obligations hereinafter described the parties agree as follows:

"1. James A. Elias will cease working for the University of Rhode Island, immediately, but will be paid at present salary until and including July 7, 1978.

"2. James A. Elias hereby resigns from his position at the University of Rhode Island and relinquishes all claims thereto effective July 7, 1978. (Letter of resignation is attached as Appendix A).

"3. For the purposes of his eligibility for unemployment benefits, James A. Elias is considered by the University to have been involuntarily terminated as of July 7, 1978, but not for such misconduct as would disqualify him from receiv[ing] unemployment compensation benefits pursuant to § 28–44–18 of the General Laws of Rhode Island.

"4. Inquiries made to the University Personnel Office regarding Mr. Elias' employment with the University will be directed to Mr. Paul Martineau who will answer such inquiries by a letter substantially identical in text to that attached hereto as Appendix B.

"5. It is understood and agreed that the notification from Dean Youngken of termination of Mr. Elias' employment as of June 30, 1978, is not now in his personnel file and shall not be placed in said file. It is further understood and agreed that no derogatory material relative to Mr. Elias is now contained in his personnel file nor shall any such materials be placed in his personnel file.

"6. Mr. Elias hereby relinquishes all claims and causes of action arising from any aspect of his employment with the Board of Regents, University of Rhode Island, or State of Rhode Island now pending or that he may otherwise have against said Board of Regents, University of Rhode Island, or State of Rhode Island. This agreement constitutes a complete and final settlement of all such claims and causes of action.

\* \* \* \* \* \*

"APPENDIX A

"I hereby resign from my position at the University of Rhode Island effective July 7, 1978.

"APPENDIX B

"Mr. James A. Elias started work at the University of Rhode Island on October 18, 1972, and worked continually to July 7, 1978, as a Clinical Instructor/Pharmacist at the University Health Service Center."

4. The real name of Elias's replacement has been changed to protect her privacy.

tal. In applying for that job he had told hospital officials that he had resigned from the university. During the course of the trial, Elias sought to show that the announcement in the college's annual report libeled him and that it breached the agreement between Elias and the university. Further, counsel indicated that the announcement caused Elias shock and embarrassment because Elias's new boss at Rhode Island Hospital, who had somehow obtained a copy of the report,[5] confronted Elias about the discrepancy between the accounts of the circumstances under which Elias departed from the College of Pharmacy. Counsel also argued that URI had been negligent in its supervision of Youngken, one of whose duties it was to oversee Elias's activities. Finally, Elias claimed that Youngken, motivated by personal animosity against Elias, had taken actions to cause Elias intentionally to suffer extreme emotional distress.

We shall deal separately with the issues of libel, breach of contract, negligent supervision, and intentional infliction of emotional distress as they pertain to this case.

### I

■■■ The first matter for resolution is whether the trial justice erred in directing a verdict for defendants on the ground that the alleged libelous statement was not defamatory. We believe that the trial justice was without error in so ruling. The question of whether or not the meaning of a particular communication is defamatory is one of law for the court. *Andoscia v. Coady,* 99 R.I. 731, 735, 210 A.2d 581, 584 (1965); Prosser and Keeton, *Torts* § 111 at 774 (5th ed. 1984); 3 Restatement (Second) Torts § 614 at 311 (1977). Guided by this principle, we examine the standards enunciated in *Reid v. Providence Journal Co.,* 20

R.I. 120, 37 A. 637 (1897), as they relate to this issue. In *Reid* this court said:

> "[A]ny words, if false and malicious, imputing conduct which injuriously affects a man's reputation, or which tends to degrade him in society or bring him into public hatred and contempt, are in their nature *defamatory* * * *." *Id.* at 124–25, 37 A. at 638. (Emphasis added.)

Having defined what is defamatory language in *Reid,* we later said that a "plaintiff * * * in order to recover, [must show] that the publication was defamatory either per se or by reason of its susceptibility of the defamatory meaning attributed to it by way of innuendo." *Andoscia,* 99 R.I. at 735, 210 A.2d at 584. Although plaintiff has never specified whether the words complained of were defamatory per se or by way of innuendo (per quod), it has been plaintiff's contention throughout that the statement "James Elias was terminated" when read in the context of other announcements concerning URI staff who either resigned or were appointed was indeed defamatory. We disagree.

■■■ In *Reid* this court stated that "language is not to be forced or tortured in libel cases in order to make it actionable. It is to be taken in its plain and ordinary sense." 20 R.I. at 122, 37 A. at 637. In its ordinary sense, an announcement of the termination of an employee, whether printed among other announcements or printed alone, is neither defamatory per se nor defamatory per quod. The American Heritage Dictionary 1254 (2d Col. ed. 1982), defines "terminate" as follows: "1. To bring to an end or halt * * * 2. To occur at or form the end of; conclude. 3. To discontinue the employment of * * *." Similarly, Black's Law Dictionary defines "terminate" thus: "[t]o put an end to; to

---

5. At trial testimony was given relating to how many copies of the annual report were distributed, and to whom. That testimony revealed that the annual report was sent to the URI administration, to the full-time faculty members within the College of Pharmacy, to the university's archives, and to the Dean's Advisory Committee, which consisted of pharmacists outside the university who advise the dean of the College of Pharmacy. Elias's supervisor at Rhode Island Hospital was not a member of any of these groups listed above, and it is unclear how he obtained a copy of the annual report.

make to cease; to end." Black's Law Dictionary 1319 (5th ed. 1979). No injury to reputation can accrue merely by the bare statement that an employee has been terminated. This observation comports with the weight of authority as expressed in various jurisdictions that have considered cases of this nature. *See* Annot., 6 A.L.R.2d 1008, 1041 (1949) ("mere notice that the employee has been discharged or is no longer connected with the employer has been generally held not to be actionable per se"); Annot., 138 A.L.R. 671, 671 (1942) ("[n]o case has been found in which the notice claimed to be libelous or slanderous consisted solely of the statement of the cessation of the prior business or professional relationship between the parties, and certainly no one would contend that such a bare statement is a libel or slander").

We observe that in the context of the numerous reported opinions dealing with an action for libel arising out of an announcement of an employee's discharge, use of the word "terminate," in comparison with the language construed elsewhere, is indeed mild and is as euphemistic and bland a description of the method of severance of Mr. Elias from URI as could be devised. In the cases that we have examined, not only was recovery denied where the words employed appeared to have been of a more negative nature but supplementary phrases expanding on the reasons for the employee's firing that were included as part of the material giving rise to the libel action were also held not to have been actionable. The dominant reasoning of these courts suggested that unless the language published was defamatory per se, the plaintiff's allegations of libel per quod were simply erroneous or too speculative and thus were without merit. *See Jack's Cookie Co. v. Brooks,* 227 F.2d 935, 937 (4th Cir.1955), *cert. denied,* 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956) ("[a]ny unexplained severance of the relationship of employer and employee gives rise to speculations as to the reasons for it in the minds of interested persons, but something more than mere speculation is required to form the basis of

a charge of libel or slander"); *Terry v. Hubbell,* 22 Conn.Supp. 248, 256, 167 A.2d 919, 923 (1960) ("[t]aken in their 'natural and ordinary meaning,' the words 'discharged for cause' mean no more than that the plaintiff was released or dismissed from an office or employment for some undisclosed circumstance which operated to produce that effect"); *Kling v. Lyons,* 345 Mass. 154, 155–56, 186 N.E.2d 186, 187 (1962) ("to report merely that a person has resigned his position, or that his employment has terminated, is not defamatory"); *Jacobs v. Transcontinental & Western Air, Inc.,* 358 Mo. 674, 216 S.W.2d 523 (1948) (termination of services, even for neglecting assigned duties, held not to be libelous); *see also Towles v. Travelers Insurance Co.,* 282 Ky. 147, 137 S.W.2d 1110 (1940); *Gartman v. Hedgpeth,* 138 Tex. 73, 157 S.W.2d 139 (1941).

More significantly, a Rhode Island case dealing with a similar subject matter provides specific guidelines respecting the defamatory quality *vel non* of the instant publication. In *Porter v. Post Publishing Co.,* 20 R.I. 88, 37 A. 535 (1897), the court considered a demurrer to a single-count declaration for libel. In the course of considering the demurrer, the court dealt with language in a newspaper article that read,

" '[a]s a matter of fact, however, action was taken which, if it had been insisted upon to the letter, would have compelled Mr. Porter to quit the parish much sooner than next Easter.' " *Id.* at 89, 37 A. at 535.

This language was held not to be defamatory, even though an innuendo in the declaration suggested that the vestrymen of Trinity Church were in possession of facts so damaging to the plaintiff's reputation, character, and standing as a clergyman that the vestrymen could have compelled the plaintiff to sever his connection with the parish and church forthwith. The court stated that "this interpretation goes beyond the fair and natural import of the language * * *." *Id.* at 89, 37 A. at 536. The court went on to suggest that the

assertion was only in respect to the action taken and did not purport to give a reason for the action. This language, of course, was much more suggestive of impropriety than the language in the case at bar. A fortiori, the neutral statement that plaintiff had been terminated could not be construed as defamatory either per se or per quod.

## II

We next turn to the issue of whether the publication of the announcement of James Elias's termination in the annual report of URI's College of Pharmacy breached the agreement entered into by Elias and his attorney with URI and its Board of Regents. The applicable provisions of the contract include a number of statements that discuss how Mr. Elias's tenure and departure from the university would be handled.[6]

■ It is plaintiff's contention that such provisions of the contract, when read as a whole, evidence a clear intent to prohibit the statement that was contained in the annual report noting Elias's termination. We do not agree. It is a fundamental principle of contract law, as well as being well settled in this state, that "clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions." *Chapman v. Vendresca*, — R.I. —, —, 426 A.2d 262, 264 (1981) (see cases collected therein). We agree with defendant's argument that a restriction in regard to the contents of an employee's personnel folder cannot be interpreted to mean that a blanket restriction on all communications about the employee would thereby come into effect. It is apparent that plaintiff,

whose counsel drafted the agreement in question, did not include the type of all-encompassing restriction upon which he now seeks to rely. There is no ambiguity in the agreement, and it relates solely to the contents of the employee's personnel file. It is not suggested that the personnel file contained any derogatory material. The publication in question (which was not part of the file) was certainly neutral and could not be tortured to be construed as derogatory.

## III

■ We come now to the third issue in this case in which plaintiff seeks review of the trial justice's grant of a directed verdict in dismissing the claim of URI's negligent supervision of Youngken. This issue needs only abbreviated comment since we have found no actionable wrong on Youngken's part. Since Youngken, as the university's employee, has committed no actionable wrong in discharging his supervisory duties to those under his direction, a fortiori no consideration of the university's conduct in overseeing Youngken need be made.

## IV

■ Lastly, we consider whether the trial justice was in error when he ruled that evidence of Youngken's conduct, when viewed in a light most favorable to Elias and with all reasonable inferences drawn in Elias's favor, failed to substantiate Elias's claim that actions taken toward him by Youngken had caused Elias to suffer extreme emotional distress. We have held in a debt collection case that a claim for intentional infliction of emotional distress requires a showing of conduct which is "ex-

---

6. These are the pertinent statements:
    "[T]he parties agree as follows:
        *    *    *    *    *    *
    "2. James A. Elias hereby resigns * * *.
    . "3. For the purposes of his eligibility for unemployment benefits, James A. Elias is considered by the University to have been involuntarily terminated * * *.
    "4. Inquiries made to the University Personnel Office regarding Mr. Elias' employ-

ment [shall be] substantially identical * * * to [the information contained in] Appendix B.
    " * * * the notification from Dean Youngken of termination of Mr. Elias' employment * * * is not now in his personnel file and shall not be placed in said file. It is further understood and agreed that no derogatory material relative to Mr. Elias is now contained in his personnel file nor shall any such materials be placed in his personnel file."

treme and outrageous." *Champlin v. Washington Trust Co. of Westerly,* —— R.I. ——, ——, 478 A.2d 985, 987 (1984). Certainly, the relationship between supervisor and employee would warrant a similar threshold of conduct upon which to base liability.

■ Assuming without deciding that paragraph six [7] of the agreement between the plaintiff and the defendants did not constitute a general release for all of Youngken's conduct prior to the plaintiff's resignation, the circumstances described fall far short of that level of conduct that could be termed either "extreme" or "outrageous." The correspondence and communications between Youngken and Elias during the first three months of 1978 might have been critical in tone and somewhat disturbing to Elias. However, no one disputes that the operation of the pharmacy was less than optimal at that time and, further, that Elias's repeated and extended absences were exacerbating an already difficult situation. We are of the opinion that, when considered in light of all the circumstances, the evidence did not create a jury question in relation to the alleged intentional infliction of emotional distress arising out of alleged extreme and outrageous conduct on Youngken's part. Accordingly, we find no error in the trial justice's direction of a verdict in favor of the defendants on this issue.

For the reasons stated, the appeal of the plaintiff is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

7. *See supra* note 3 and accompanying text.