# United States Court of Appeals
## For the First Circuit

No. 20-2023

JOHN DOE,

Plaintiff, Appellant,

v.

BROWN UNIVERSITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Kayatta and Howard, Circuit Judges,
and Casper, District Judge.*

Susan Kaplan, with whom Kaplan Law and Sonja L. Deyoe were on brief, for appellant.
Steven M. Richard, with whom Nixon Peabody LLP was on brief, for appellee.

August 4, 2022

---

* Of the District of Massachusetts, sitting by designation.

**KAYATTA**, <u>Circuit Judge</u>.  Shortly after he began his freshman year at Brown University, John Doe, an African-American man, had a brief encounter with Jane Doe, a white woman.[1]  Their stories of what happened differ slightly in emphasis but are generally consistent.  They met at a bar and both decided to move to an outside patio.  There, they kissed.  The pair then moved to a small alleyway behind the building -- the record is unclear whether Jane or John initiated the relocation to the more private spot.  According to Jane (as expressed in her formal complaint about the incident), John became more aggressive and repeatedly tried to lift her dress without her express permission.  According to John, Jane was aggressive throughout the encounter, choking him, biting his lip, and telling him, "Stop, I make the rules."  Jane admitted going "for his neck" and saying, "Stop, I make the rules here."  John said that, feeling uncomfortable, he ended the interaction and walked away.

A few months later, Jane filed a complaint against John with Brown's Office of Student Life, commencing a multi-year process leading to John's suspension from school, a suicide attempt, and, eventually, this lawsuit by John against Brown.  For the reasons that follow, we affirm the grant of summary judgment dismissing John's federal claims, reverse the grant as to his state

---

[1]  Following the lead of the district court and the parties, we refer to the students involved by pseudonyms.

law claim for intentional infliction of emotional distress, and remand for further proceedings.

## I.

Because this is an appeal from the grant of summary judgment, we recount the facts not as they necessarily are, but rather as a jury might reasonably find them to be in favor of John, the non-movant. See Brader v. Biogen Inc., 983 F.3d 39, 44 (1st Cir. 2020).

After Jane filed her complaint in November 2013, the Associate Dean of Student Life, Yolanda Castillo-Appollonio, informed John of the allegations against him and that the school would begin an investigation. John was also informed that he had a right to provide a list of witnesses and a written statement to assist the investigation and that he had a right to choose an advisor to help shepherd him through the process. Dean Castillo also issued a mutual no-contact order to both students.

Shortly after he was notified of the complaint, John met with Dean Castillo and expressed his desire to file a counter-complaint against Jane. Dean Castillo discouraged him from doing so. John recalls her telling him that she could not help him file a complaint and that she made it sound as if he would have to start a separate process only after the current complaint process concluded. This advice did not accord with Brown's rules, which permitted counter-complaints. Dean Castillo also determined that

John's version of Jane's conduct did not rise to sexual assault in her eyes because John did not explicitly say "that there was no consent to the activity" or "that he said, stop doing that." Dean Castillo did not file a complaint against Jane on John's behalf, nor did she initiate any investigation of Jane.

Brown eventually decided that, despite John's statement that Jane choked and bit him, John alone should be charged with three violations of its Code of Student Conduct. Brown charged John not only with sexual misconduct, but also with committing acts that could "be reasonably expected to result in physical harm to a person or persons" and "[m]isconduct that includes . . . violent physical force or injury." Brown also charged John with illegal underage use of alcohol.

The school then held a hearing, after which the Student Conduct Board found John responsible for sexual misconduct "that involves non-consensual physical contact of a sexual nature" and for illegally drinking alcohol (which he had admitted). The Board did not find John responsible for either charge related to physical harm. As a sanction, Brown applied a "deferred suspension" that would expire at the end of the following academic year. Deferred suspension is somewhat akin to probation. It provides the student "the opportunity to demonstrate the ability to abide by the community's expectations of behavior," but it also means that any new allegations "will receive greater scrutiny," and it

"increase[s] the likelihood" of "more serious outcomes," "including separation from the University." Jane appealed this decision because she believed the sanction was not severe enough. Brown denied the appeal. John later testified that, despite his belief that Brown reached the wrong result, he did not appeal because he "was put on probation" and not "suspended or expelled." He "was ready to move on."

In the spring of 2014, during a conversation among sorority sisters regarding "certain men on campus," Jane stated that John tried to touch her inappropriately, that he choked her, and that he was sexually aggressive, but she did not mention that she bit or choked him. Sally Roe was a part of that conversation. She told her sorority sisters that she and John had met at a party and consensually kissed. She explained that he wanted to take a shower with her and continued to encourage her (either verbally or physically, she couldn't remember) even after she said no. When she started to feel uncomfortable, she left "[a]nd that was the end of [their] interaction."[2]

After hearing Sally's story, Jane sought "permission" to share it with a dean at Brown. Sally agreed, after which a dean "asked [Sally] to come in and make a formal complaint."[3] Sally

_____

[2] John's interaction with Sally happened after the incident with Jane but before Jane filed her complaint.

[3] Sally testified that she couldn't remember if she contacted

- 5 -

then met with that dean in person. She prefaced the meeting by explaining that she was not formally complaining that John sexually assaulted her; rather, she was reporting him "more for [the] protection of others" because he had the "potential to have other negative interactions with women." She thought her interaction "could potentially have led to sexual assault." Sally testified that her view of John's character was based on the fact that he supposedly "continued to have uncomfortable interactions" with Jane.

Sally also filled out a "Campus Incident Complaint Form." On that form, she alleged that in October 2013 "a boy that [she] was with tried to force [her] to have a shower with him." She explained that she had consensually kissed the boy, but, after he tried to take a shower with her, she "promptly left and told him [she] wasn't comfortable." Sally also asked for a no-contact order to be put in place.

Upon receiving the written complaint, Dean Castillo -- who was not the dean who initially met with Sally -- repeatedly sought to meet with her to confirm that John was the person against whom she had filed a formal complaint. Sally was initially nonresponsive, but eventually told Dean Castillo that she requested no "serious action" and had in fact "felt forced to

the dean first or if the dean contacted her.

report."  The day after Sally responded, May 7, 2014, the Office of Student Life nevertheless sent John three letters:  The first informed him that someone had filed a complaint against him for actions that could be considered "[s]exual [m]isconduct that involves non-consensual physical contact of a sexual nature" and/or "[s]ubjecting another person . . . to abusive, threatening, intimidating, or harassing actions."  The second letter informed him that he and Sally should have no contact.  And the third ordered him removed from campus for an indefinite period of time, "effective immediately."  To justify this removal, Brown decided to treat John "a danger to [himself] or the immediate well-being of the University community."

Dean Maria Suarez -- who was the Associate Director of Brown's Psychological Services -- and Dean Castillo met with John that day to explain his removal.  When Dean Suarez told John that he had been accused of sexual assault again, he became distraught and expressed suicidal thoughts.  He fell to the floor, rolled into a ball, and cried.  Both Dean Suarez and Dean Castillo testified that they found John's response extreme.  They permitted him to remain on campus to finish his finals (the letter came in the middle of finals week), but he was required to immediately leave campus once his last exam was over.

In light of John's response, Dean Suarez brought John to the Brown University Counseling and Psychological Services (CAPS)

for an emergency crisis evaluation. The doctor who evaluated him at CAPS was concerned and recommended hospitalization, which John rejected. Because the doctor did not feel that John's presentation "rose to the level of an involuntary hospitalization," she made a plan with John on what to do if he had any further suicidal ideation, and she scheduled a follow-up appointment with him. John went back to CAPS at least twice more before he was required to leave campus after his final exam the following week.

Over the summer, Dean Castillo reached out to Sally three more times asking her to meet about the incident. Sally did not respond. Throughout that summer, John and his mother repeatedly contacted school officials asking for updates on the investigation and his suspension. The University gave little information in return. By August, Vice President Margaret Klawunn, prompted by an email from John, decided that Brown had to "wrap this up so that [John] can come back for the fall" if Sally was not going to pursue the complaint. On August 7, Dean Castillo informed John by email that Brown was "lifting the emergency removal" and that he would "be able to resume classes and all activities for the upcoming fall [2014] semester." She also explained that, although they were closing this complaint for now, the school could "choose to proceed at a later time" if it received more information.

The fall semester did not go well for John. He had trouble attending classes and by late October was told by one

professor not to come back to class. That led John to again seek crisis help at CAPS, which resulted in a referral for a psychiatric evaluation that occurred the following day. He reported sleeping sixteen hours a day, feeling anxious about the state of his family due to the second accusation, having difficulty in his interactions with women, having trouble managing anger, binge-drinking, and smoking marijuana daily. He was diagnosed with Major Depressive Disorder and was prescribed antidepressant medication.

A day later, after smoking marijuana with some friends, John dove onto the windshield of a truck as it was slowing to a stop. He was taken to Rhode Island Hospital, where he was given an Initial Psychiatric Evaluation. He explained during the evaluation that he had been "ruminating on the charges against him and convinced himself he could be guilty." He maintained that he was not guilty, but he explained that those thoughts triggered "a panic attack," which caused "an impulsive urge to stop the panic attack." He remained in the psychiatric ward of Rhode Island Hospital for four days.

Upon discharge, John met with Dr. Jackie Twitchell from CAPS for a post-hospitalization evaluation. He explained to Dr. Twitchell the same thoughts he had expressed at the hospital that led to his suicide attempt. Dr. Twitchell noted that John "want[ed] to stay at Brown" and "hope[d] he [could] catch up on his studies."

After the meeting with John, Dr. Twitchell told Dean Suarez that John was not an immediate threat to himself or others but that she recommended intensive treatment. She told Dean Suarez that she did not discuss with John whether he could stay on campus. Dean Suarez then met with John about his hospitalization. Afterward, Dean Suarez and Dr. Twitchell spoke again. Dean Suarez stated that "she could not put him on mandatory medical leave" and that "he was not willing to go voluntarily." She also expressed that she thought he displayed narcissistic traits and was unrealistic about his ability to "pull up his academics" and play lacrosse.

Dean Suarez then told Dr. Twitchell that she and Vice President Klawunn were planning to meet with John that evening -- just hours after he was released from the hospital -- to tell him that Jane had newly alleged that he had violated the still extant no-contact order,[4] that he would therefore have to move out of his

---

[4] As described by Jane, the first two incidents occurred at Brown-associated events hosted at an off-campus local bar. Jane alleged that when John saw Jane "he moved away from [her] inside." She stated that "[w]hile he would move away from [her]" each time they ended up together, she felt "the need to leave." (For the second event at the same location, Jane indicated that John was "less responsive" in moving away from her than the first time.)

The third incident occurred at a "Greek council meeting" Jane was attending as a board member. She complained that John "walked in" and "hung out for a minute or so before leaving."

In the fourth interaction, Jane described John drunkenly entering a room at another bar off campus. When Jane's friend

housing in his lacrosse fraternity based solely on those uninvestigated allegations,[5] and that there would be new conduct charges filed against him for underage drug use and for the damage to the truck he threw himself in front of. Dr. Twitchell "expressed [her] concern for [John's] safety if these charges were brought against him the same night that he was discharged from the hospital and asked that this be delayed in light of his recent suicide attempt." Dean Suarez rejected the advice, saying that they had to act that evening because John could not return to his room in light of the new (though, by this point, over a week old) allegations by Jane that John had violated the no-contact order. They then "discussed how much he should know up front and how much should be mediated given his fragile state." Dean Suarez also

_____

asked him to leave because Jane was there, he left. Ten minutes later, he "poked his head in and looked around," saw Jane, and "left the room again."

In the final incident, Jane described being outside a fast-food restaurant on the phone when John entered the restaurant with a friend. She "then entered [the restaurant] to get [her] own dinner, as he was at the register." She "had planned on eating there," but "felt the need to take [her] dinner to go." There is no allegation he purposefully ate dinner at the restaurant to cause her to leave.

[5] According to Dean Castillo, the typical process for dealing with no-contact order accusations did not involve immediate suspension. Instead, the first step was to have an instructional conversation with the accused student regarding the parameters of the order. If further action were required, Brown would hold a hearing. A hearing was reserved for "persistent and repeated" violations that had been addressed but for which there had been no change or for "significant and clearly intentional" violations, such as "banging on [the person's] door."

said that she would make sure that John's mother stayed with him that night. Dr. Twitchell "made it clear that CAPS would be available to support [John] if contacted [that night] or in the future."

Despite Dr. Twitchell's warning, Dean Suarez and Vice President Klawunn went ahead with the meeting. Accompanied by his mother, John attended. Without first ascertaining what John was intending to do regarding medical leave, the two Brown University officials told John that if he did not voluntarily go on leave, he would face a litany of consequences. They first threatened him with two additional conduct charges (for vandalism of the truck he jumped in front of and for the alleged violations of his no-contact order with Jane). They told him that he would be required to pay for the damage to the truck. They said that he would be immediately removed from his on-campus housing based on Jane's new no-contact allegations. Finally, they threatened to revive Sally's complaint (even though there was no new information since Sally declined to press forward). As Dr. Twitchell predicted, John had an extreme reaction to this litany of threats. He jumped from his seat and cried, "Do you just want me out of here?" His mother intervened and said, "Enough! This is enough! You have traumatized him enough! And you have traumatized me!"

Relenting to the threats, John began voluntary medical leave, effective November 5, 2014, for two full semesters. John's

psychological expert -- whom Brown did not move to exclude below even while seeking to strike his expert on damages -- concluded that "the mandate that [John] be removed from the Brown campus for a year of purported medical leave without any known clinical basis for such a decision" -- that is, the result of the meeting with Dean Suarez and Vice President Kulwann -- "caused overwhelming psychological damage in [John] that continues to reverberate in him to the present in many spheres of his life." The expert also concluded that John "suffers from enormous, life-altering psychological harm in [the] aftermath" of "the manner in which Brown University conducted itself in managing the[] accusations against [John]." The manifestation of that harm includes "Persistent Depressive Disorder," which "is marked by pervasively depressed mood, markedly diminished energy and motivation, hypersomnia, hypophagia, diminished libido, anhedonia, hyperirritability, feelings of helplessness, and feelings of hopelessness."

In the summer of 2015, John applied for readmission to Brown for the fall semester. His application included letters by a clinical psychologist who concluded that he was "ready to be reintegrated into the Brown community, given his ongoing positive mental state." Brown, however, denied his application, stating that it "need[ed] to see a longer period of sustained stability." John's father then emailed Brown's president to complain that he

believed John had been and was continuing to be discriminated against on the basis of race. John also appealed the decision though regular channels and provided supplemental information, including various letters of support. Brown reversed course and permitted John to return to school for the fall 2015 semester.

In September 2015, shortly after the semester began, Jane wrote to Dean Castillo to express her concern that she saw John on campus even though she had been told he was not going to be there until the spring, if at all. Dean Castillo confirmed that John was on campus and apologized for not warning Jane because she thought Jane was going to be off campus that semester. The record then falls silent from the beginning of the fall 2015 to the middle of the spring 2016.

In April 2016, Jane, who herself was on medical leave, again emailed Dean Castillo to let her know that she would be visiting Brown for a weekend and that she was concerned that John would not "respect" the no-contact order that was still in effect two years after he was found responsible for their alleyway encounter. Dean Castillo thereupon "update[d]" the no-contact order so that it became unilateral rather than mutual; in other words, it became solely John's responsibility to stay away from Jane rather than a shared responsibility to avoid each other.

John objected, explaining that he had been given a no-contact order against Jane, that it seemed to have been taken away

- 14 -

without any process, and that Jane should also continue to be required to leave an event if she showed up and he was there. Dean Castillo rejected John's objections. She explained that the burden should be solely on John since he was found responsible for the conduct Jane complained of two years prior. She also explained that the University had updated its policies so that it was explicit that when a student is found responsible, the no-contact order automatically becomes unilateral. Dean Castillo told John that she was simply implementing that change in policy, even though it had been put in place after his hearing had ended and his chance to appeal had expired.

Over the next two years, John generally stayed out of trouble, and, in May 2018, he graduated from Brown.

## II.

A year before he graduated, John filed this lawsuit in Rhode Island state court, alleging that Brown discriminated against him because of his race, gender, and disability, created a hostile educational environment, violated various contractual agreements and promised procedural protections, and intentionally inflicted emotional distress upon him. Brown removed the case to federal court and moved to dismiss. After giving John an opportunity to amend his complaint, the district court dismissed several of his claims. It held that John's gender-based claims under Title IX of the Civil Rights Act, 20 U.S.C. § 1681 et seq.,

regarding Jane's complaint were filed outside Rhode Island's three-year statute of limitations for personal injury. Doe v. Brown Univ., 327 F. Supp. 3d 397, 407, 410 (D.R.I. 2018) (applying R.I. Gen. Laws § 9-1-14(b) to John's Title IX claims).[6] The court also dismissed John's Title IX "erroneous outcome" claim as to Sally's complaint because Brown dropped its investigation, id. at 412, his state-law disability claim because he failed to plead any denied accommodations, id. at 413-14, and all but one of his contract claims -- the one related to his May 2014 suspension -- for failure to state a claim, id. at 415-18. The court permitted the rest of his claims to go forward.

After nearly a year and a half of discovery, Brown moved for summary judgment. It argued primarily that John failed to uncover any racial or gender discrimination or harm. It also contended that it did not breach any contract related to John's suspension and that its conduct could not support a claim for intentional infliction of emotional harm. The district court granted Brown's motion across the board. See Doe v. Brown Univ., 505 F. Supp. 3d 65 (D.R.I. 2020).

---

[6] We have not yet decided which statute of limitations is applicable to Title IX claims, but district courts within our purview have held that the forum state's limitations period for personal-injury claims applies. See, e.g., Doe v. Lincoln-Sudbury Reg'l Sch. Comm., No. 20-cv-11564, 2021 WL 3847985, at *6 (D. Mass. Aug. 27, 2021); Lakshman v. Univ. of Me. Sys., 328 F. Supp. 2d 92, 116 (D. Me. 2004). No one challenges the district court on this score.

- 16 -

On appeal, John only timely develops arguments in support of three causes of action. First, he claims that Brown committed gender discrimination in violation of Title IX by doggedly investigating Sally's claim against him, even though it did nothing to pursue his allegations against Jane. Second, he alleges that Brown engaged in race discrimination in connection with a whole series of events beginning with its treatment of Jane's complaint, all in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq.; 42 U.S.C. § 1981; and the Rhode Island Civil Rights Act (RICRA), R.I. Gen. Laws § 42-112-1.[7] And he claims that Brown should be held liable for the tortious conduct of its officials in intentionally causing him severe emotional distress under Rhode Island common law.

John's reply brief presumes that he also is challenging the dismissal of claims based on maintaining a hostile environment and a claim alleging a violation of Title IX by selectively enforcing rules against him as compared to Jane. His opening brief, however, developed no substantial argument as to these claims. Rather, he merely set out -- in a section entitled "Race Discrimination" -- his version of how Jane assaulted him and later

_____

[7] Rhode Island courts look to federal law in construing their analogous civil rights statutes, see Colman v. Faucher, 128 F. Supp. 3d 487, 491 n.8 (D.R.I. 2015) (citing Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 (R.I. 2004)); accordingly, we need determine only whether John's discrimination claims are sound under federal law.

- 17 -

harassed him without connecting those facts to the elements of a sex-based discrimination claim or a sex-based hostile educational environment claim. He passingly averred in a footnote that "the arguments in this section regarding race could equally apply to a gender-bias analysis" under RICRA, but such attempts to bootstrap argumentation "in a perfunctory manner . . . are deemed waived," United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). He failed even to make a similar attempt for his federal-law claims. And John did not mention (much less contest) in his opening brief the district court's application of the three-year statute of limitations to his selective-enforcement claim regarding Brown's handling of Jane's complaint. His cursory attempts to revive these claims in reply are both too little and too late. See id.; Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000) ("[I]ssues advanced for the first time in an appellant's reply brief are deemed waived.").

John has also not advanced on appeal any claim that Brown's action in suspending him breached any contract between Brown and its students. Compare Doe v. Trs. of Bos. Coll., 892 F.3d 67, 80-89 (1st Cir. 2018). Nor is Brown subject to the due-process constraints that apply to state-run schools. Compare Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 65 (1st Cir. 2019) ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due

process." (alteration in original) (quoting <u>Gorman</u> v. <u>Univ. of R.I.</u>, 837 F.2d 7, 12 (1st Cir. 1988))).

We therefore consider only the three claims first mentioned above: (1) that Brown selectively enforced its Code of Student Conduct against John in response to Sally's complaint because he is male, (2) that Brown discriminated against him on account of his race throughout its handling of the allegations made by Jane and Sally, and (3) that Brown officials intentionally caused him severe emotional distress. We review the grant of summary judgment de novo. <u>Irobe</u> v. <u>U.S. Dep't of Agric.</u>, 890 F.3d 371, 377 (1st Cir. 2018).

## III.

We turn first to John's claim that Brown discriminated against him by selectively enforcing its policies against him as a male student. John offers two reasons that he says could support a jury's finding that Brown selectively enforced its rules and procedures due to his gender.

First, he contends that Brown customarily wields its investigation and prosecutorial resources very disproportionately against males, pointing out that "<u>all</u> students accused of sexual misconduct at Brown were male" during the relevant period. But the same could likely be said of any institution or workplace that accepts similar complaints: More women lodge complaints of sexual misconduct by men than vice versa. <u>See</u> The Women's Initiative,

- 19 -

*Gender Matters: Women Disproportionately Report Sexual Harassment in Male-Dominated Industries*, Center for American Progress (Aug. 6, 2018), https://www.americanprogress.org/article/gender-matters/ (aggregating EEOC data regarding workplace sexual harassment filings from 2010 through 2015 that show that, "in every industry, women have higher rates of reporting sexual harassment than men").  Such proof, without more, hardly shows that the recipient of these complaints is responsible for the disparate distribution.  See Doe v. Univ. of Denver, 952 F.3d 1182, 1194 (10th Cir. 2020) ("In Title IX challenges to sexual-misconduct proceedings, however, the putative nondiscriminatory causes of disparity -- the gender makeup of sexual-assault perpetrators, victims, and reporters -— are almost completely beyond the control of the school.").

Second, John's alternative argument is a so-called "comparator" argument, through which a plaintiff can prove intent to discriminate based on "evidence of past treatment toward others similarly situated." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004).  John contrasts the manner in which Brown brushed off his claim that Jane bit and choked him during their alleyway encounter

with its Javert-like pursuit of Sally's withdrawn claim.[8]  For comparator proof to raise a red flag that the direct evidence does not already raise, the two "incidents' circumstances [must] be 'reasonably comparable'" and "the nature of the infraction and knowledge of the evidence by college officials [need be] sufficiently similar to support a finding of facial inconsistency."  Id. (quoting Albert v. Carovano, 851 F.2d 561, 573-74 (2d Cir. 1988) (en banc)).  "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  Id. Although "[e]xact correlation is neither likely nor necessary," "the cases must be fair congeners."  Id.  "In other words, apples should be compared to apples."  Id.

By the time Sally filed her complaint, John had already been found responsible for sexual misconduct under Brown's Code of Student Conduct.  It is rational for an administrator, upon receiving a sexual-assault complaint, to treat someone who had already been found responsible for sexual misconduct differently than someone who had not.  Indeed, Brown had so informed John in

---

[8]  We assume without deciding that Brown's handling of John's allegations against Jane can be used as comparator evidence, even though Dean Castillo's repudiation of those allegations occurred outside of the statute-of-limitations period.  See Flores v. City of Westminster, 873 F.3d 739, 754 (9th Cir. 2017) (holding that evidence regarding "appropriate comparators" was "properly admissible" even though the events occurred outside the statute of limitations).

writing at the conclusion of the proceedings concerning Jane's complaint:  It explained that any new allegations "will receive greater scrutiny" and "increase the likelihood" of "more serious outcomes," "including separation from the University."  So, we do not see enough similarity to support a reasonable inference that Brown's different treatment of the two accusations is due to the gender of the accused.  That conclusion, in turn, leaves John with no support in this record for his claim of selective enforcement based on gender.

## IV.

We consider next John's race-based claims.  Brown concedes that the section 1981 claim is not time-barred in any material respect.  And while Brown does not so concede as to the Title VI and RICRA race discrimination claims, our analysis of these claims on the merits renders any difference in the applicable limitations periods moot.

To succeed on his race-based claims, John must show, among other things, that Brown acted with discriminatory intent. Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (noting that "direct or circumstantial evidence of racial animus" is "a necessary component" of both section 1981 and Title VI claims). To make such a showing, John devotes a large portion of his brief to chronicling all the ways he believes Brown treated him unfairly. Viewing the evidence in a light favorable to John, as we must, a

jury could certainly find that Brown persecuted John with unreasonable zeal and, on occasion, with no fair process. A jury could also find that the initial finding of fault was also unreasonably used as a basis to allow Jane to use seemingly trivial violations of the no-contact order to chase John out of all sorts of campus events, with Brown itself twisting its own rules in aid of Jane's efforts. See n.4, supra.

All that being said, there is no evidence that would allow a reasonable jury to conclude that Brown's persecution of John was on account of his race. John points to no direct evidence of racial animus. The only person who even mentioned race was John's father, who suggested to Brown's president that racial discrimination was a possible motivation for Brown's June 2015 denial of John's request for readmission. Less than a week after that mention of race -- and after he submitted supplemental materials responding to the reasons for the initial denial -- John was readmitted. For obvious reasons, we are loath to say that such a chronology ending in John's request being granted evidences racial animus by Brown. To do so would create a disincentive to provide an accommodation whenever an accusation of discrimination is made.

Without direct evidence of racial discrimination, John is left to argue that the reasons Brown has given for treating

- 23 -

John adversely are pretextual.[9]  Sometimes a plaintiff can generate an inference of discriminatory animus by showing that the defendant's stated reason for its actions is not only false, but "a sham intended to cover up the [defendant's] real and unlawful motive."  Joseph v. Lincare, 989 F.3d 147, 160 (1st Cir. 2021) (quoting Theidon v. Harvard Univ., 948 F.3d 477, 497 (1st Cir. 2020)).

Over the whole saga of Brown's interactions with John, Brown has consistently posited an overarching reason for its treatment of John: the complaints from Jane and Sally.  There is nothing in the record to suggest that that stated reason was a sham designed to cover up a racial motive.  In theory, that leaves open the possibility that Brown acted with even more zeal and unfairness in handling those complaints against John than it would have against a white male student.  But John presents zero evidence of that.

---

[9] Our consideration of pretext is derived from a burden-shifting framework the Supreme Court articulated in the context of Title VII, employment-discrimination claims.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).  Although we have held that the McDonnell Douglas framework applies to section 1981 claims, Pina v. Children's Place, 740 F.3d 785, 796 (1st Cir. 2014), we have never so held for Title VI claims, see Goodman v. Bowdoin Coll., 380 F.3d 33, 44–45 (1st Cir. 2004).  The parties, however, assume this framework applies to each of John's race-based claims, and since it does not affect the outcome of this case, we follow their lead.  Cf. Trs. of Bos. Coll., 892 F.3d at 91–92 (1st Cir. 2018) (applying the standard agreed to by the parties).

In so stating, we acknowledge that sexual relations have often provided the context for invidious racial discrimination and noxious stereotypes. See, e.g., FBI, History: Emmett Till, https://www.fbi.gov/history/famous-cases/emmett-till. But when a university has prosecuted dozens of male students for infractions of its rules that attempt to regulate sexual conduct on campus, and not one iota of evidence has been produced suggesting that Brown pursued white men with either less zeal or more fairness than was manifest in its treatment of John, a jury cannot simply assume that race was a factor. To rule otherwise would be to say that every charge of sexual misconduct against any African-American student would, without more, support a trial on a race-discrimination claim.

**V.**

Finally, we consider John's state-law claim that Brown intentionally inflicted emotional distress upon him. To create liability for intentional infliction of emotional distress in Rhode Island, "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." Gross v. Pare, 185 A.3d 1242, 1246 (R.I.), as corrected (Aug. 16, 2018) (emphasis removed) (quoting Swerdlick v. Koch, 721

- 25 -

A.2d 849, 862 (R.I. 1998)).  Moreover, as one component of the severity requirement, Rhode Island requires plaintiffs to show some "physical symptomatology resulting from the alleged improper conduct."  Vallinoto v. DiSandro, 688 A.2d 830, 838 (R.I. 1997) (citing Reilly v. United States, 547 A.2d 894, 898 (R.I. 1988)).

On appeal, John's tort claim focuses largely (but not exclusively) on the post-hospitalization meeting in which Dean Suarez and Vice President Klawunn threatened him with additional disciplinary charges and suspended him from campus effective immediately, all on the basis of uninvestigated claims that he violated the no-contact order with Jane.  The district court concluded that the administrators' actions in this meeting could not be the basis for an intentional infliction of emotional distress claim because "[c]ourts must be 'chary about interfering with academic and disciplinary decisions made by private colleges and universities.'"  Brown Univ., 505 F. Supp. 3d at 82 (quoting Schaer v. Brandeis Univ., 735 N.E.2d 373, 381 (Mass. 2000)).  It recognized that "the second investigation understandably impacted John negatively," but concluded that "there is no evidence that would allow a jury to reasonably conclude that Brown's conduct was so outrageous or so extreme" for liability to attach.  Id.  We disagree.

We start with the second element of this tort:  Whether a jury could find Brown's actions extreme and outrageous.  "In

assessing whether conduct is extreme and outrageous, Rhode Island courts have used three factors: 1) the conduct itself; 2) the particular relationship of the parties; and 3) the known or knowable susceptibility of the plaintiff to the emotional injury." Marques v. Fitzgerald, 99 F.3d 1, 7 n.12 (1st Cir. 1996). The Rhode Island Supreme Court, adopting the Second Restatement of Torts standard, requires a defendant's conduct to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Swerdlick, 721 A.2d at 863 (emphasis removed) (quoting Restatement (Second) of Torts § 46 cmt.d (1965)). In other words, "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. (quoting Restatement (Second) of Torts § 46 cmt.d). Although this is a "very high standard," Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1089 (R.I. 2004), for several reasons, as combined, a jury could find this standard satisfied by Brown's conduct.

First, the parties' relationship required at least some heightened solicitude by Brown. The Restatement states that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or

- 27 -

power to affect his interests." Restatement (Second) of Torts § 46 cmt.e. Discussing this factor, a member of our court once found that it naturally applies to the university-student relationship. See Russell v. Salve Regina Coll., 649 F. Supp. 391, 402 (D.R.I. 1986) (Selya, J.) (Russell I); see also Russell v. Salve Regina Coll., 890 F.2d 484, 487 (1st Cir. 1989) (Russell II) (acknowledging that the school relationship to a student is an important factor to consider, despite affirming a directed verdict for the school), rev'd on other grounds, 499 U.S. 225 (1991); Restatement (Second) of Torts § 46 cmt.e (noting that "school authorities . . . have been held liable for extreme abuse of their positions"). This is because a "student stands in a particularly vulnerable relationship vis-a-vis the university, the administration, and the faculty." Russell I, 649 F. Supp. at 402. Thus, a university can "fairly be expected" to act "maturely -- and even with some tenderness and solicitude -- toward" its students. Id.

Second, it is quite clear from the record that Dean Suarez and Vice President Klawunn were aware of John's enhanced susceptibility to extreme emotional distress. See Russell II, 890 F.2d at 487 (explaining that "knowledge of plaintiff's special sensitivities" is an element of the claim and that the "school officials knew very quicky that Russell wanted badly to become a nurse and that she was easily traumatized by comments about her

weight"); see also Restatement (Second) of Torts § 46 cmt.f ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress."). Dean Suarez participated in a prior disciplinary meeting with John where his emotional reaction was so strong that it prompted her to immediately walk him to the campus mental health center for an emergency evaluation. Dean Suarez and Vice President Klawunn both knew that John had just been discharged from the hospital that very day after a suicide attempt premised on Brown's disciplinary actions against him. And, most strikingly, Vice President Klawunn was warned by one of John's doctors that she should postpone the meeting given John's fragile mental state. At the very least, the doctor advised, they should only bring up any matters that needed to be discussed that day (such as any necessary immediate suspension from housing). A jury could conclude from these facts that their subsequent conduct in confronting John "become heartless, flagrant, and outrageous when the[y] proceed[ed] in the face of such knowledge, where it would not be so if [they] did not know." Restatement (Second) of Torts § 46 cmt.f.

Third, the meeting itself did not comport with the reason given for its supposed urgency. If it were urgent to tell John he was suspended because of Jane's new, facially dubious and seemingly trivial allegations, they simply had to tell him that. Instead,

- 29 -

or so a jury might find, they attempted to coerce him into withdrawing by piling on threatened claims that need not have been advanced that evening. Jurors might reasonably ask, why threaten John with reopening the Sally complaint and with charging him for damage to the truck? Brown has made no attempt to argue why those matters could not have been delayed, given its administrators' knowledge of John's mental state and warning from his doctor. A jury could -- but need not -- find that this piling on of charges that evening while John was obviously vulnerable went beyond all bounds of decency.

Finally, we agree in theory but dispute in application the dissent's concern that Brown cannot be liable for intentional infliction of emotional distress if it did "no more than to insist upon [its] . . . legal rights in a permissible way," even if it were "well aware that such insistence is certain to cause emotional distress." Norton v. McOsker, 407 F.3d 501, 511 (1st Circ. 2005) (internal citations and quotation marks omitted).

To start, jurors might well disagree with our dissenting colleague that Brown was entitled to immediately remove John from campus based on Jane's unconfirmed, dubious allegations of no-contact order violations or that the Brown officials were acting in good faith in threatening to reopen Sally's complaint. Recall, Dean Castillo testified that the typical process for dealing with no-contact order accusations did not involve immediate suspension;

- 30 -

rather, the school was to begin with an instructional conversation with the accused student regarding the parameters of the order. See n.5, supra. If the action persisted, the student was entitled to a hearing. Id. Brown forwent any process here. And, as the dissent acknowledges, Brown had informed John that it could reopen Sally's complaint only if it "obtain[ed] additional information relevant to the matter," yet Brown officials threatened to reopen Sally's complaint despite having no new information.

Further, the legal entitlement to act with impunity only applies when the defendant asserts its rights "in a permissible way" and does "no more." Norton, 407 F.3d at 510-11. The manner in which the action is taken is still subject to tort-law limitations. See Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996) (acknowledging that, even though simply insisting on your legal rights "could not ordinarily lead to liability," a plaintiff could show "more" to "defeat the privilege and state a claim" (emphasis added) (quoting Howell v. N.Y. Post Co., 612 N.E.2d 699, 705 (N.Y. 1993))); Champlin v. Washington Tr. Co., 478 A.2d 985, 989 (R.I. 1984) ("[A] creditor or his agent is privileged to use a number of tactics to collect a debt, even though those tactics may cause the debtor to suffer emotional distress," and "the creditor should be held accountable only if those tactics are extreme and outrageous."); see also Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46

- 31 -

cmt.e (2012) ("Although an actor exercising legal rights is not liable . . . merely for exercising those rights, the actor is not immunized from liability if the conduct goes so far beyond what is necessary to exercise the right that it is extreme and outrageous.").

Moving on, we also conclude that there are triable issues regarding the first element of the tort, that is, whether Dean Suarez and Vice President Klawunn "inten[ded]" or acted "in reckless disregard of the probability of causing emotional distress." Gross, 185 A.3d at 1246 (quoting Swerdlick, 721 A.2d at 862). Proceeding with the coercive attempt in the face of the physician's warning could certainly be seen as evidencing a reckless disregard for the distress likely to be caused.

Our decision here is bolstered by comparison to another case where we found the defendant "crossed" "the requisite 'threshold of conduct'" under Rhode Island law, such that the question was appropriate for a jury. See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 381 (1st Cir. 1991) (quoting Elias v. Youngken, 493 A.2d 158, 164 (R.I. 1985)). There, an insurer -- after learning that the insured misrepresented his medical history and employment -- downgraded the policy and delayed benefit payments to induce the insured to sign a new contract agreeing to the switch. Id. at 380-81. After detailing the unsavory tactics the insurer used, we concluded that "a rational jury could well

have thought that a large, moneyed corporation preyed mercilessly on a disabled individual's physical and mental condition by withholding and delaying benefit payments and by lying to him, in order to coerce him into surrendering his insurance coverage through age 65 and accepting an inferior replacement policy." Id. at 381. We think a jury is at least as able to find the Brown officials crossed the line here as well.

Brown advances no argument on appeal that a jury could not find in John's favor on the remaining two elements of the tort: causation and severity.[10] In any event, the chronology and the conclusions of John's psychological expert regarding causation and the manifestations of John's distress, summarized above, would seem to provide at least the minimal degree of support required to get over the Rule 56 hurdle. See Castellucci v. Battista, 847 A.2d 243, 249 (R.I. 2004) (relying on a psychiatrist's opinion connecting the event at issue to plaintiff's "posttraumatic stress disorder, which continued to traumatize him and compromise his

---

[10] Brown argued below that, although the October 2015 meeting was contentious, "anything said or done cannot be causally linked to John's distress because he and his mother had decided before the meeting that he should take a leave from Brown to address his physical and mental health." But this argument overlooks both the record, which would support a finding that John was not resolved to withdraw voluntarily, and the fact that if Brown were correct then there would have been no need to have lodged the barrage of threats.

ability to function or sleep" to conclude that there was "clear evidence of causation and physical symptomatology").

## VI.

For these reasons, we <u>affirm</u> in part, <u>reverse</u> in part, and <u>remand</u> for proceedings not inconsistent with this opinion.[11] The parties will bear their own costs.

**- Dissenting Opinion Follows -**

---

[11] We have left only one state-law claim in play, while affirming judgment against John on all of his federal-law claims. Had subject-matter jurisdiction been based solely on the presence of federal questions, our decision would have required the district court to decide whether to "retain or disclaim [supplemental] jurisdiction over the remaining state law claim[]." <u>Penobscot Indian Nation</u> v. <u>Key Bank of Me.</u>, 112 F.3d 538, 564 (1st Cir. 1997). But John has also relied upon diversity jurisdiction, alleging that he and Brown "are citizens of different states and the amount in controversy exceeds $75,000."

**CASPER**, __District Judge__, **dissenting**. I respectfully dissent from one aspect of the majority's opinion. I would affirm the district court's ruling on summary judgment in all respects, including that regarding John's intentional infliction of emotional distress ("IIED") claim. The Circuit has recognized that "__Champlin__ [v. __Washington Trust Co.__, 478 A.2d 985, 990 (R.I. 1984)] appeared to treat the question whether conduct is sufficiently extreme and outrageous as one of law," __Fudge__ v. __Penthouse Int'l__, 840 F.2d 1012, 1021 (1st Cir. 1988), and summary judgment is warranted where "the circumstances described fall far short of that level of conduct that could be termed either 'extreme' or 'outrageous.'" __Elias__, 493 A.2d at 164 __cited in__ __Borden__, 935 F.2d at 381 (ruling that the IIED high threshold had been crossed where the insurance company, with "no entitlement to downgrade the policy," did so, delayed benefit payments to the insured and then lied to him about the difference between the original policy and the downgraded one). Even confining my analysis to the second element of the claim -- whether a jury could find Brown's actions, particularly as to the October 28th post-hospitalization meeting, extreme and outrageous -- the grant of summary judgment in the university's favor was warranted.

As to the __Marques__ factors cited by the majority for determining whether conduct is extreme and outrageous, a jury would have before it the college-student relationship between the

parties (which was reflected not just in the October 28th meeting, but also in the provision of CAPS counseling and academic advising and prior contact with John's mother) and that John had exhibited emotional distress prior to the meeting of which the Brown officials were aware. It, however, would also be left with Brown's conduct of the October 28th meeting, the event that, now on appeal, is the centerpiece of John's IIED claim. During this meeting called by Dean Suarez and Vice President Klawunn, John was not alone but accompanied by his mother. At the time of this meeting, it was undisputed that, only two months into the semester of his sophomore year, John was not doing well academically, was exhibiting emotional distress and behavior that resulted in self-harm and property damage warranting psychiatric evaluation and hospitalization, and now also had allegations of violating the no-contact order against him by Jane. Given these circumstances, it is not surprising (and undisputed) that John was considering a leave before this meeting and Dean Suarez and the Vice President were as well. Even viewing the record in the light most favorable to John that Brown threatened John with additional conduct charges (related to substance abuse and damage to the truck), or action on Jane's new no-contact allegations or revisiting Sally's complaint,[12] these were all actions that Brown could take. See

_____

[12] Brown had closed an investigation of Sally's complaint in

Norton v. McOsker, 407 F.3d 501, 511 (1st Cir. 2005) (affirming summary judgment for defendant, noting that "[t]he actor is never liable . . . where [he] has done no more than to insist upon his . . . legal rights in a permissible way, even though he . . . is well aware that such insistence is certain to cause emotional distress" (internal citations and quotation marks omitted)). It is not a free pass from liability to acknowledge that this principle in Norton also applies where school administrators pointedly lay out a range of adverse consequences in a difficult meeting with John and his parent. As the district court recognized, "[s]tudent disciplinary investigations and the face-to-face meetings no doubt could cause a wide range of emotional distress." The question for the jury, however, is whether Brown's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Swerdlick, 721 A.2d at 863 (emphasis and internal citation omitted). On the record before this Court and in light of the very high legal standard that applies, I respectfully submit that a reasonable jury could not find for John on this claim.

August 2014 but had advised John at that time that "[i]f we obtain additional information relevant to the matter we may choose to proceed at a later time."

- 37 -

Accordingly, I would affirm the district court's grant of summary judgment for Brown on this claim as well.